**Slip Op. 00-37**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

TAIWAN SEMICONDUCTOR
INDUSTRY ASSOCIATION, ET AL.,

               Plaintiffs,

        and

MOTOROLA, INC.,

               Plaintiff-Intervenor,

        v.

UNITED STATES,

               Defendant,

        and

Micron Technology, Inc.

               Defendant-Intervenor.

</td><td>

BEFORE: Pogue, Judge

Court No. 98-05-01460

</td></tr>
</table>

[The International Trade Commission's determination on remand is remanded.]

                             Decided: April 11, 2000

White & Case, LLP (Christopher F. Corr, Richard G. King, and Amy E. Farrell) for Plaintiffs.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Michael Diehl, Office of the General Counsel, U.S. International Trade Commission, for Defendant.

Hale and Dorr LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz) for Defendant-Intervenor.

**OPINION**

**POGUE, Judge:** On June 30, 1999, the Court remanded this matter to the U.S. International Trade Commission ("Commission"). See Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT __, 59 F. Supp. 2d 1324 (1999)("Taiwan I").[1] In that decision, the Court reviewed Plaintiffs' USCIT Rule 56.2 motion for judgment on the agency record challenging the Commission's final determination that the industry in the United States producing static random access memory semiconductors ("SRAMs") was materially injured by reason of imports from Taiwan that were sold at less than fair value ("LTFV"). See id.

The Commission found in its final determination that "[t]he domestic industry's financial troubles [were] due in significant part to the price depressing effects of the subject imports from Taiwan on the domestic like product[.]" Static Random Access Memory Semiconductors from the Republic of Korea and Taiwan, Inv. Nos. 731-TA-761 & 762 (Final)(List 2, Doc. 395)(Apr. 9, 1998) at 37 ("Final Determination").[2] The Commission, however, did not

---

[1]Familiarity with the Court's previous decision is presumed.

[2]List 1 consists of the documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record.

adequately explain how it avoided attributing to the subject imports the harmful effects from other known sources of injury; therefore, the Court remanded the determination to the Commission for reconsideration consistent with the Court's opinion.  See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1336.  On remand, the Commission again determines that the domestic industry was materially injured by reason of LTFV imports of SRAMs from Taiwan. See Commission's Determ. on Remand (List 2, Doc. 406)(Aug. 30, 1999) at 1 ("Remand Determination").

In reviewing the Commission's remand determination, this Court is presented with the following issues: (1) whether the procedure the Commission followed on remand was lawful; and (2) whether the Commission's remand determination that the domestic industry was materially injured by reason of LTFV imports of SRAMs from Taiwan is supported by substantial evidence and otherwise in accordance with law.


**Discussion**

**1.  Did the Commission conduct its remand proceedings in accordance with law?**

Antidumping proceedings, including the Commission's injury determination under 19 U.S.C. § 1673d(b)(1994), "are investigatory

in nature[,]" rather than adjudicatory in nature.  See Statement of Administrative Action, H.R. Doc. No. 316, 103rd Cong., 2nd Sess. (1994), reprinted in Uruguay Round Agreements Act, Legislative History, Vol. VI, at 892 ("SAA"); see also Grupo Industrial Camesa v. United States, 18 CIT 461, 463, 853 F. Supp. 440, 442-43 (1994), aff'd, 85 F.3d 1577 (Fed. Cir. 1996).  As such, the provisions of the Administrative Procedure Act ("APA") do not apply to the Commission's injury investigation.  Cf. GSA, S.R.L. v. United States, 24 CIT ___, ___, 77 F. Supp. 2d 1349, 1359 (1999); see also 19 U.S.C. § 1677c(b)(1994)("The [Commission's] hearing shall not be subject to the provisions of [5 U.S.C. §§ 551 et seq.], or to [5 U.S.C. § 702].").

After completing an investigation, the six commissioners comprising the Commission, see 19 U.S.C. § 1330(a)(1994), vote on whether the domestic industry has been injured by reason of the subject imports.  "If the Commissioners voting on [an injury] determination . . . are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination."  19 U.S.C. § 1677(11)(1994).  "[T]he Commission may function notwithstanding vacancies." 19 U.S.C. § 1330(c)(6).

At the time of the original final determination regarding

SRAMs from Taiwan, the Commission was only composed of three members: Chairman Miller, Vice Chairman Bragg, and Commissioner Crawford.  See Final Determination at 3 n.1.  Vice Chairman Bragg found that the U.S. industry was materially injured by reason of LTFV imports of SRAMs from Taiwan, with Chairman Miller dissenting. See id. at 33 n.168.  Commissioner Crawford, apparently, had recused herself.  See id.  Thus, Vice Chairman Bragg's decision constituted an affirmative determination of the Commission pursuant to 19 U.S.C. § 1677(11), and the publication of the Commission's final determination was entitled "Views of the Commission."  See Final Determination at 3.  Accordingly, when the Court remanded, it ordered the Commission to reconsider its affirmative determination, without directing the remand to Vice Chairman Bragg alone.  See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1336.

By the time of the remand, three new members had been appointed to the Commission: Commissioner Askey, Commissioner Koplan, and Commissioner Hillman.  In addition, then Vice Chairman Bragg had become Chairman, and then Chairman Miller had become Vice Chairman.  Although the Commission was therefore composed of the full six commissioners, only Chairman Bragg prepared views on remand.  See Remand Determination at 1 n.1.  "The Commission, with Commissioner Crawford not participating, submit[ted] Chairman

Bragg's remand views to the Court[] as its 'Views on Remand[.]'"
Id.; see also Action Jacket Approval Record, Pls.' Resp. to Remand
Views, Ex. 1.   Moreover, "[b]ecause Vice Chairman Miller's
[dissent] was unaffected by the Court's remand order, she did not
take part in this remand proceeding."  See Remand Determination at
1 n.1.

Plaintiffs now argue that "[t]he remand determination was not
an institutional response, and therefore it was unlawful."  Pls.'
Resp. to Remand Views at 2.  According to Plaintiffs, the remand
determination only represents the views of Chairman Bragg, rather
than the views of the Commission as an institution.  See id. at 9.
Because the applicable statute, case law, and this Court's remand
order all compel an institutional response, Plaintiffs maintain,
all eligible commissioners should have participated in the
determination on remand.  See id. at 2.  Plaintiffs assert that
Vice Chairman Miller, Commissioner Koplan, Commissioner Askey, and
Commissioner Hillman did not participate in the remand proceeding.
See id. at 2.[3]

_____

[3]Plaintiffs do not appear to challenge Commissioner
Crawford's non-participation.  See Pls.' Resp. to Remand Views at
2.  The original and remand determinations merely indicate that
Commissioner Crawford did not participate in both decisions
without explaining why she was excused.  See Final Determination
at 33 n.168; Remand Determination at 1 n.1.  Nevertheless, both

The plain language of the statute indicates that remands from this court are indeed made to the Commission as a whole: "If the final disposition of an action brought under this section is not in harmony with the published determination of . . . the Commission, the matter shall be remanded to the . . . Commission . . . for disposition consistent with the final disposition of the court." 19 U.S.C. § 1516a(c)(3)(1994).

Likewise, this court has recognized the general rule that, where possible, all sitting commissioners should participate in a remand made to the Commission. See Trent Tube Div. v. United States, 14 CIT 780, 784, 752 F. Supp. 468, 472 (1990)("[R]emands to the Commission ordering explanations of the views of individual members require an 'institutional response' irrespective of the makeup of the Commission's membership at the time it receives remand instructions."), aff'd, 975 F.2d 807, 814 (Fed. Cir. 1992)("[The CIT] was free, within reasonable limits, to set the parameters of the remand, which required an institutional response irrespective of flux in the Commission's membership."); Metallverken Nederland B.V. v. United States, 14 CIT 481, 490, 744

---

Plaintiffs and Defendant appear to agree that she had validly recused herself and was therefore ineligible. See Pls.' Resp. to Remand Views at 2-3; Def.'s Resp. to Cmts. on Remand Determination at 3.

F. Supp. 281, 288 (1990)(recognizing that remands are generally to the Commission as a whole)(citing 19 U.S.C. § 1516a(c)(3)(1988)); Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1176 n.2, 704 F. Supp. 1068, 1070 n.2 (1988)("[R]emands are made to the [Commission], not to the individual commissioners. Where possible all commissioners should participate in remand determinations."); USX Corp. v. United States, 12 CIT 844, 845, 698 F. Supp. 234, 236 n.3 (1988)(indicating that a newly-appointed commissioner, not on the Commission at the time of the original decision, should have participated in the remand because "remand is made to the entire Commission[;] [t]he Commission, rather than individual commissioners, acts"); SCM Corp. v. United States, 2 CIT 1, 7, 519 F. Supp. 911, 915 (1981)("Clearly, the Commission, like this Court, is a continuing institution, regardless of changes in its membership.").

In addition, although the Court has the authority to remand the individual views of specific commissioners, see, e.g., Nippon Steel Corp. v. United States, 19 CIT 827, 827-28 (1995); Bando Chemical Indus., Ltd. v. United States, 16 CIT 133, 137, 787 F. Supp. 224, 227 (1992), aff'd, 26 F.3d 139 (Fed. Cir. 1994), in this case, the Court ordered "the Commission" to reconsider its

affirmative determination, instead of remanding the determination to Chairman Bragg, the author of the Commission's original majority determination, alone. See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1336. To be sure, the Court could have more specifically instructed that its remand was directed to the entire Commission. See Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1231, 704 F. Supp. 1075, 1103 (1988)("This remand is directed to the entire Commission, and not just individual commissioners.")(citing Asociacion Colombiana, 12 CIT at 1176 n.2, 704 F. Supp. at 1070 n.2). Nevertheless, this Court has the authority to construe its own remand order. See Laitram Corp. v. NEC Corp., 115 F.3d 947, 950-51 (Fed. Cir. 1997)(citing In re Sanford Fork & Tool Co., 160 U.S. 247, 256 (1895)).

Therefore, based on the relevant statutory provision, the case law, and the Court's remand order in Taiwan I, the Court agrees with Plaintiffs that all eligible commissioners should have participated in the remand. To prevail, however, Plaintiffs must still satisfy their burden of demonstrating to the Court that all the eligible commissioners did not meaningfully participate in the remand.

The presumption of regularity supporting the acts of agency officials mandates that, "in the absence of clear evidence to the

contrary, courts presume that they have properly discharged their official duties."  United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926).  Consistent with this principle, in United States v. Morgan, 313 U.S. 409, 422 (1941), the Supreme Court held that courts cannot probe the extent of an agency official's consideration and understanding of an issue in making a decision.  Subsequently, the Supreme Court has qualified Morgan to the limited extent that a court may probe an agency official's thought processes if the challenger makes a "strong showing of bad faith or improper behavior" on the part of the agency official, and the agency has supplied the basis of its decision in formal findings.  See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971).

In applying these principles, federal courts have consistently recognized that challengers must satisfy a high burden in order to rebut the presumption that agency officials have adequately considered the issues in making a final decision, including their reading and understanding of the record evidence.  See, e.g., Franklin Savings Ass'n v. Ryan, 922 F.2d 209, 211 (4th Cir. 1991)("Since Morgan, federal courts have consistently held that, absent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in

reaching a decision, 'including the manner and extent of his study of the record[.]'")(citations omitted); <u>Nat'l Small Shipments Traffic Conference, Inc. v. ICC</u>, 725 F.2d 1442, 1450 (D.C. Cir. 1984)("Because of the strong presumption of regularity in administrative proceedings, reviewing courts will not normally entertain procedural challenges that members of the body inadequately considered the issues before reaching a final decision[.]"); <u>Nat'l Nutritional Foods Ass'n v. FDA</u>, 491 F.2d 1141, 1144-46 (2d Cir. 1974); <u>Grupo Industrial Camesa</u>, 18 CIT at 463-64, 853 F. Supp. at 443.

Here, while the record does warrant concern, Plaintiffs have not made the clear showing of misconduct required to rebut the presumption of regularity. To prove that no commissioners other than Chairman Bragg meaningfully participated in the remand, Plaintiffs point to a footnote of the remand determination and to the Commission Action Jacket Approval Record. <u>See</u> Pls.' Resp. to Remand Views at 10-11 (citing Remand Determination at 1 n.1 and Action Jacket Approval Record, Ex. 1 to Pls.' Resp. to Remand Views).

The remand determination footnote states,

The views of Chairman Bragg comprised the Commission's determination in this investigation. The Commission, with Commissioner Crawford not participating, submits

Chairman Bragg's remand views to the Court, as its "Views on Remand" providing further explanation of the Commission's original determination in response to the Court's decision.  Vice Chairman Miller reaffirms her negative views in this investigation.  Because Vice Chairman Miller's negative determination was unaffected by this Court's remand order, she did not take part in this remand proceeding.

Remand Determination at 1 n.1.

Interpreting this footnote, Plaintiffs argue that the remand determination did not constitute an institutional response from the full Commission because Chairman Bragg alone prepared remand views. See Pls.' Resp. to Remand Views at 9-10.  It is not necessary, however, for each commissioner to participate in drafting the decision or to submit individual views. Rather, the statute merely requires a single, written determination from the Commission, leaving to each commissioner's discretion whether to prepare separate or dissenting views.  See 19 U.S.C. §§ 1673d(d), 1677(7)(B); cf. H.R. Rep. No. 96-317, 96th Cong., 1st Sess. at 46 (1979)("[T]he Committee [on Ways and Means] intends that the [Commission] determination, as well as any dissenting or separate views of the individual Commissioners, be specific in its statement of findings of fact and conclusions of law.").  Accordingly, it is appropriate for commissioners to adopt one another's views. Cf. Hannibal Indus., Inc. v. United States, 13 CIT 202, 203, 710 F.

Supp. 332, 334 (1989)("On remand, the Chairman adopted the Vice Chairman's views on causation and her finding of no material injury.").

The remand determination footnote states, "The Commission, with Commissioner Crawford not participating, submits Chairman Bragg's remand views to the Court, as its 'Views on Remand[.]'" Remand Determination at 1 n.1 (emphasis added).  In this light, it appears that newly-appointed commissioners Askey, Koplan, and Hillman adopted Chairman Bragg's remand views.  Employing the presumption of regularity in agency decision making, the Court presumes that commissioners Askey, Koplan, and Hillman would not have chosen to adopt Chairman Bragg's views as the views of the Commission without an adequate consideration of the issues and the record evidence.  Therefore, they presumably participated in the remand determination.

At the same time, the remand determination footnote states that Vice Chairman Miller reaffirmed her dissent.  See id.  The last sentence of the footnote, however, calls Vice Chairman Miller's participation into question, as it states that "she did not take part in this remand proceeding."  Id.  Nevertheless, this tension in language does not clearly indicate that Vice Chairman Miller did not participate in the remand.  Employing the

presumption of regularity in interpreting the entire footnote, we conclude that Miller's continued dissent constituted participation, as it indicates that she considered the merits of the decision. Therefore, reviewing the remand determination footnote, the Court must presume that Vice Chairman Miller meaningfully took part in the remand proceeding.

Similarly, the Commission Action Jacket Approval Record does not undermine the presumption that all eligible commissioners meaningfully participated in the remand determination. The Action Jacket Approval Record is simply a sheet of paper indicating that each commissioner, with the exception of Commissioner Crawford, approved the remand views drafted by Chairman Bragg. See Action Jacket Approval Record, Pls.' Resp. to Remand Views, Ex. 1. Plaintiffs argue,

> The vote sheet shows that neither Vice Chairman Miller nor any of the other three qualified sitting Commissioners adopted the remand determination as their own or reviewed the record evidence to respond to the Court's Order, let alone participated in any analysis on remand. The vote sheet shows that the other Commissioners merely approved of the procedural maneuver whereby only one Commissioner's views were submitted in response to the Court's remand Order.

Pls.' Resp. to Remand Views at 10. Plaintiffs, however, make inferences that this Court will not make. Rather, absent hard evidence to the contrary, the Court must presume that the

commissioners would not have approved submitting to the Court the remand views prepared by Chairman Bragg without an understanding of the determination's merits.[4]

The Court recognizes that Vice Chairman Miller wrote on the vote sheet, "I note for the record that I would have preferred an institutional response to this remand." Action Jacket Approval Record, Pls.' Resp. to Remand Views, Ex. 1 (emphasis added). This statement does raise flags. Nevertheless, considered in conjunction with the remand determination's pronouncement that the Commission submitted Chairman Bragg's views as the Commission's "Views on Remand" and with each commissioner's recorded approval on the vote sheet, Vice Chairman Miller's statement does not rise to the level of "a clear showing of misconduct or wrongdoing" necessary to override the presumption of regularity. See Franklin Savings Ass'n, 922 F.2d at 211.

On this record, it is not clear that the Commission on remand

---

[4]The Court notes that the Action Jacket Approval Record indicates that Vice Chairman Miller also approved the remand views drafted by Chairman Bragg. This seems inconsistent with the remand determination's indication that Miller maintained her dissent. See Remand Determination at 1 n.1. Interpreting the evidence as a whole, however, the Court must presume that Vice Chairman Miller approved submitting to the Court the remand views of Chairman Bragg as the Commission's remand determination because the draft noted her dissent. Seen in this light, there is no inconsistency.

did not conduct a formal re-vote on the merits.  It may be that

Plaintiffs' concerns are justified, and that the deliberations did

not include all of the sitting Commissioners as contemplated by the

statute.  But the Court will not presume misconduct based on

suspicion alone.  The evidence does not clearly show that the full

Commission did not meaningfully participate in the remand in

accordance with 19 U.S.C. § 1516a(c)(3), the case law, and this

Court's remand order.[5]  Finally, we note that, because we are

_____

[5]Plaintiffs offer additional arguments in support of their
belief that the Commission's proceedings on remand violated the
spirit of the Court's remand order.  See Pls.' Resp. to Remand
Views at 11-14.  In reviewing Plaintiffs' arguments, the Court
notes that "[t]he Commission has broad discretion in fashioning
its procedures."  Metallverken, 14 CIT at 490, 744 F. Supp. at
288 (citing FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143
(1940)).  Moreover, as discussed above, the presumption of
regularity dictates that, "in the absence of clear evidence to
the contrary, courts presume that [agency officials] have
properly discharged their official duties."  Chemical Foundation,
272 U.S. at 14-15.
        Plaintiffs first argue that the Commission failed to provide
public notice of its remand proceeding.  See Pls.' Resp. to
Remand Views at 11.  Such notice was unnecessary, however, as the
Court's previous opinion notified the parties of the remand.  See
Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1336-37.
        Plaintiffs next argue that the Commission failed to "offer
interested parties an opportunity to be heard[.]"  Pls.' Resp. to
Remand Views at 11.  As mentioned above, however, antidumping
proceedings are investigatory, rather than adjudicatory, in
nature.  See SAA at 892; see also NEC Corp. v. United States, 21
CIT 933, 948-49, 978 F. Supp. 314, 329 (1997).  Accordingly, the
Commission permissibly interprets its role in conducting an
investigation as fact-finding.  See U.S. Int'l Trade Comm'n,
Guidelines for Hearings, Pub. 3183, at 1 (Mar. 1999).  In

remanding the decision for the reasons explained below, Plaintiffs

will, in any event, be afforded the full Commission's

reconsideration of the merits of the injury determination.

**2.   Is the Commission's remand determination supported by substantial evidence and otherwise in accordance with law?**

The Court must sustain the Commission's remand determination

unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."     19 U.S.C. §

1516a(b)(1)(B)(i).

**A. Background**

The statute directs the Commission to "make a final

---

remanding this matter, the Court did not order the Commission to reopen the record for the gathering of further evidence. See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1336-37. Therefore, it was within the Commission's discretion not to solicit further comments from interested parties on remand.

Finally, Plaintiffs argue that the Commission improperly refused to permit briefs and exhibits that Plaintiffs had previously submitted to this Court to be added to the record of the remand proceeding. See Pls.' Views on Remand at 11, 12-13. As noted, however, the Court did not instruct the Commission to reopen the record. Moreover, Plaintiffs' case briefs presumably contained arguments that the Commission had already heard. See 28 U.S.C. § 2637(d)(requiring the exhaustion of administrative remedies). Lastly, because the exhibits Plaintiffs presented at oral argument before this Court on May 26, 1999, were merely charts constructed using data already on the record, it was within the Commission's discretion to decide whether to receive them. See Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985)("It is within the Commission's discretion to make reasonable interpretations of the evidence[.]").

determination of whether . . . an industry in the United States . . . is materially injured . . . by reason of [the subject] imports[.]"  19 U.S.C. § 1673d(b).  "The term 'material injury' means harm which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).  Moreover, the "by reason of" language "mandates a showing of causal--not merely temporal-- connection between the [subject imports] and the material injury." Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997).  In turn, the causation standard "requires adequate evidence to show that the harm occurred 'by reason of' the [subject] imports, not by reason of a minimal or tangential contribution to material harm[.]"  Id. at 722.[6]

In examining "whether [the subject] imports have caused

---

[6]Following the Federal Circuit's decision in Gerald Metals, 132 F.3d 716, this Court ordered the Commission to reconsider its affirmative material injury determination concerning imports of pure magnesium from the Ukraine.  See Gerald Metals, Inc. v. United States, 22 CIT ___, 8 F. Supp. 2d 861 (1998).  This Court then sustained the Commission's subsequent remand determination. See Gerald Metals, Inc. v. United States, 22 CIT ___, 27 F. Supp. 2d 1351 (1998), appeal dismissed for appellant's failure to prosecute in accordance with Federal Circuit Rule 31(a), No. 99- 1166 (Fed. Cir. Apr. 16, 1999).  Although in Gerald Metals the Federal Circuit and this Court interpreted the statute as it existed prior to the enactment of the Uruguay Round Agreements Act ("URAA") on January 1, 1995, the "by reason of" standard articulated therein applies to the amended statute.  See Taiwan I, 23 CIT at ___, 27 F. Supp. 2d at 1329.

material injury to a domestic industry," the Commission is required under 19 U.S.C. § 1677(7)(B) to consider three factors: (1) the volume of the subject imports; (2) the effect of the subject imports on prices of domestic like products; and (3) the impact of the subject imports on domestic producers of like products.[7]  <u>Id.</u> at 719.  The Commission evaluates the volume and price effects of the subject imports and their consequent impact on the domestic industry by applying the standards set forth in 19 U.S.C. § 1677(7)(C).[8]  <u>See</u> <u>U.S. Steel Group v. United States</u>, 96 F.3d 1352,

---

[7]In addition, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  19 U.S.C. § 1677(7)(B)(ii).

[8]The relevant portions state:

(i) Volume

In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

(ii) Price

In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whetherB
        (I) there has been significant price
        underselling by the imported merchandise

as compared with the price of like
products of the United States, and
(II) the effect of imports of such
merchandise otherwise depresses prices to
a significant degree or prevents price
increases, which otherwise would have
occurred, to a significant degree.

(iii) Impact on affected domestic industry

In examining the impact required to be considered
under subparagraph (B)(i)(III), the Commission
shall evaluate all relevant economic factors which
have a bearing on the state of the industry in the
United States, including, but not limited toB
(I) actual and potential decline in
output, sales, market share, profits,
productivity, return on investments, and
utilization of capacity,
(II) factors affecting domestic prices,
(III) actual and potential negative
effects on cash flow, inventories,
employment, wages, growth, ability to
raise capital, and investment,
(IV) actual and potential negative
effects on the existing development and
production efforts of the domestic
industry, including efforts to develop a
derivative or more advanced version of
the domestic like product, and
(V) in a proceeding under [19 U.S.C. §§
1673-1673h], the magnitude of the margin
of dumping.

The Commission shall evaluate all relevant
economic factors described in this clause within
the context of the business cycle and conditions
of competition that are distinctive to the

1360 (Fed. Cir. 1996); see also Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994 (Antidumping) at Art. 3.1 ("Antidumping Agreement").

"Thus, after assessing whether the volume, price effects, and impact of the subject imports on the domestic industry are significant, the statutory 'by reason of' language implicitly requires the Commission to 'determine whether these factors as a whole indicate that the [subject] imports themselves made a material contribution to the injury.'"[9]  Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1327-28 (quoting Gerald Metals, 22 CIT at ___, 27 F. Supp. 2d at 1355); see also 19 U.S.C. § 1673d(b)(1). Accordingly, "the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."  SAA at 851-52.[10]

---

affected industry.

19 U.S.C. § 1677(7)(C).

[9]The presence or absence of any factor is not necessarily dispositive to a finding of material injury.  See 19 U.S.C. § 1677(7)(E)(ii).  The Commission has discretion to weigh the significance of each factor in light of the circumstances.  See Iwatsu Electric Co., Ltd. v. United States, 15 CIT 44, 49, 758 F. Supp. 1506, 1510-11 (1991).

[10]In its remand determination, the Commission suggests that the non-attribution requirement is satisfied by assuring that the injurious effects ascribed to the subject imports are not

"effects _entirely_ caused" by other factors.  Remand Determination
at 9 n.34.  In making this assertion, the Commission quotes an
isolated sentence from the GATT 1947 Panel Report in the
Norwegian Salmon case.  See Imposition of Anti-dumping Duties on
Imports of Fresh and Chilled Atlantic Salmon from Norway, Apr.
27, 1994, GATT B.I.S.D. (41st Supp.) at 423 ("_Norwegian Salmon_").
The SAA endorses _Norwegian Salmon_ as illustrative of a proper
causation analysis.  See SAA at 851.

Without more, however, a reliance on this isolated statement
from _Norwegian Salmon_ is misplaced.  First, the GATT Panel's
statement that it could not find that the Commission "had
attributed to the Norwegian imports effects _entirely_ caused by"
other factors was made in direct response to Norway's argument
that "_any_ material injury to the [United States] Atlantic salmon
industry . . . was caused by factors other than imports from
Norway[.]"  _Norwegian Salmon_ at 423 (emphases added).

Second, this interpretation of the SAA's non-attribution
requirement could render the statutory "by reason of" language
meaningless.  The statute's "by reason of" language indicates
that the Commission cannot satisfy "its burden of proof by
showing that the LTFV goods _themselves_ contributed only minimally
or tangentially to the material harm."  _Gerald Metals_, 132 F.3d
at 722 (emphasis added).  To conclude that non-attribution merely
requires the Commission to ensure that it does not attribute to
the subject imports injury caused _entirely_ by other factors,
however, could allow the Commission to violate this language
because overall injury to a domestic industry is often caused by
a variety of factors.  As explained by this Court,

> Frequently, several events--each of which is a
> necessary antecedent and has an appreciable effect--
> contribute to overall injury to an industry.  In some
> cases, another event may have such a predominant effect
> in producing the harm as to make the effect of the LTFV
> imports insignificant and, therefore, to prevent the
> LTFV imports from being a material factor.  (This is
> not to say, however, that there may not be more than
> one material factor to injury.)  In addition, even if
> no contributing factors independently have a
> predominant effect, their combined effect may dilute
> the effect of the LTFV imports, preventing the LTFV

In reviewing the Commission's original determination, the Court could not discern how the Commission ensured that it did not attribute the harmful effects from other recognized factors to the subject imports.  See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1335-36.    Therefore, the Court remanded the Commission's affirmative injury determination for "reconsideration consistent with this Court's opinion."  Id. at ___, 59 F. Supp. 2d at 1336. On remand, the Commission again determines that the industry in the United States producing SRAMs was materially injured by reason of imports of SRAMs from Taiwan that the Department of Commerce found were sold at LTFV.  See Remand Determination at 1.

## B. Volume Effects

The statute requires the Commission to determine "whether the

---

imports from being a material factor.  The statute requires that the Commission determine whether the LTFV imports themselves made a material contribution to the injury suffered by the domestic industry.

Gerald Metals, 22 CIT at ___, 27 F. Supp. 2d at 1355 n.8. "That the injurious effects from other sources may be greater than the effect of the subject imports is not determinative, [however,] so long as the Commission reasonably finds that the subject imports' contribution to the overall harm is material."  Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1330-31.  "[T]he Commission need not weigh (i.e., determine which is greater or lesser) causes in complying with the 'by reason of' standard."  Id. at ___, 59 F. Supp. 2d at 1331.

volume of [the subject imports], <u>or any increase in that volume,</u> <u>either in absolute terms or relative to production or consumption</u> <u>in the United States</u>, is significant."    19 U.S.C. § 1677(7)(C)(i)(emphasis added).   "'This language when read in conjunction with the legislative history indicates that disjunctive language was chosen to signify congressional intent that the agency be given broad discretion to analyze import volume in the context of the industry concerned.'"   <u>USX Corp.</u>, 12 CIT at 848, 698 F. Supp. at 238 (1988)(quoting <u>Copperweld Corp. v.  United States</u>, 12 CIT 148, 167, 682 F. Supp. 552, 570 (1988)); <u>see also</u> S. Rep. No. 96-249, 96[th] Cong., 1[st] Sess. at 88 (1979).

In its original determination, the Commission evaluated the significance of the subject imports' volume in both absolute <u>and</u> relative terms, without indicating whether its determination relied upon both findings.  <u>See</u> Final Determination at 33-34.  In <u>Taiwan</u> <u>I</u>, the Court  sustained the Commission's finding that the subject imports' nearly threefold increase in absolute volume was significant.  <u>See</u> <u>Taiwan I</u>, 23 CIT at ___, 59 F. Supp. 2d at 1331. The Court could not, however, "sustain the Commission's additional conclusion that the subject imports' increase relative to U.S. consumption was significant."  <u>Id.</u>  The record evidence indicated that non-subject imports of SRAMs greatly exceeded the imports of

Taiwanese SRAMs in terms of both absolute and relative increases in volume[11] and were recognized by the Commission as a potential source of injury to the domestic industry.  See id. at ____, 59 F. Supp. 2d at 1331-32.  Therefore, "without an explanation of how the relatively small volume of Taiwanese imports was significant given the dominant presence of non-subject imports," the Court could not sustain the Commission's additional conclusion that the subject imports' increase relative to U.S. consumption was significant. Id. at ___, 59 F. Supp. 2d at 1332.

On remand, the Commission clarifies that its determination was not dependent on its finding of relative significance; rather, its finding that the absolute increase in subject imports was significant alone supported its determination regarding the volume factor.  See Remand Determination at 5.  As mentioned, the Court previously held that substantial evidence supported the Commission's conclusion that the absolute increase in imports of Taiwanese SRAMs was significant.  See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1331.  Therefore, recognizing that the Commission has discretion to analyze the volume of subject imports in either

---

[11]Throughout the period of investigation, non-subject imports maintained a much higher U.S. market share than Taiwanese imports.  See Staff Report (List 2, Doc. 34) at IV-9, Table IV-4 ("Staff Report").

an absolute or relative sense, the Court sustains the Commission's

conclusion that the overall volume of subject imports was

significant as supported by substantial evidence.[12]

_____

[12]Because substantial evidence supports the Commission's
conclusion that the volume of the subject imports was significant
based on its determination regarding absolute volume alone, the
Court need not address the Commission's additional determination
regarding the imports' relative volume.  Nevertheless, the Court
notes an argument raised by the Commission on remand in
connection with the Court's prior instruction for the Commission
to explain "how the relatively small volume of Taiwanese imports
was significant given the dominant presence of non-subject
imports[.]"  Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1332.
Addressing the Court's instruction, the Commission states,

> The Norwegian Salmon panel holds that there is "not . .
> . a requirement that imports from third countries not
> subject to investigation be considered as part of an
> examination of the significance of an increase in the
> volume of imports from a country whose imports [are]
> the subject of an anti-dumping duty investigation."

Remand Determination at 4 (citing Norwegian Salmon at 406).
Thus, the Commission argues that a comparison of the respective
volumes of the Taiwanese and non-subject imports was not required
to evaluate the significance of the Taiwanese imports' relative
volume.
     If the Commission evaluates the significance of the subject
imports without regard to causation, such a comparison may indeed
not be necessary.  Cf. Angus Chemical, 140 F.3d 1478, 1485 (Fed.
Cir. 1998)(indicating that, under a two-step method of causation,
the statutory factors of 19 U.S.C. § 1677(7)(B) may be evaluated
before conducting "the additional analytical step of determining
the precise causal connection between the imports and any
perceived harm to the industry").  But see Taiwan I, 23 CIT at
___, 59 F. Supp. 2d at 1332 n.12.
     In determining the ultimate issue of causation, however, it
may be necessary to consider large volumes of non-subject
imports.  The SAA specifically endorses the causation standard

## C. Price Effects

### 1. Introduction

The statute provides that, in evaluating the effect of the subject imports on domestic prices,

> [T]he Commission shall consider whether--(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

The Court previously sustained as supported by substantial evidence the Commission's conclusion that there was significant price underselling by the Taiwanese imports.  See Taiwan I, 23 CIT

---

employed in Norwegian Salmon.  See SAA at 851.  In the sentence immediately following the Commission's above quote, the GATT panel states, "A consideration of the volume of imports from . . . third countries might be relevant for the purpose of determining the existence of a causal relationship between the allegedly dumped imports under investigation and material injury to a domestic industry."  Norwegian Salmon at 406.  Moreover, the Antidumping Agreement explicitly states,

> The authorities shall also examine any known factors other than the dumped imports which at the same time are injuring the domestic industry, and the injuries caused by these other factors must not be attributed to the dumped imports.  Factors which may be relevant in this respect include . . . the volume and prices of imports not sold at dumping prices . . . .

Antidumping Agreement at ¶ 3.5 (emphasis added).

at ___, 59 F. Supp. 2d at 1333.  The Court could not, however, sustain the Commission's conclusion that the Taiwanese imports had significant price depressing effects during 1996 and 1997 as supported by substantial evidence.[13]  See id. at ___, 59 F. Supp. 2d at 1333-36.

First, the Court expressed concern that "the Commission found that the subject imports had significant price depressing effects despite the fact that the record indicate[d] that during 1996 and 1997 the majority of the Taiwanese imports oversold the domestic product."  Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1333.  The Commission collected price information for six SRAM products, designating them products 1 through 6.  Newer Taiwanese products 1 and 2, which accounted for less than 25% of Taiwanese imports in 1996 and less than 33% in 1997, significantly undersold the equivalent domestic products during 1996 and 1997.  See Staff Report at V-6 to V-8, Tables V-1 and V-2.  Older Taiwanese products 3 and 5, however, accounted for over 50% of Taiwanese imports in 1996 and over 67% in 1997, and generally oversold the equivalent

---

[13]The years 1994 through 1997 encompass the period of investigation.  Nevertheless, the Commission permissibly focuses on the more recent 1996-97 period in evaluating the causal effects of the subject imports.  See, e.g., Chr. Bjelland Seafoods A/S v. United States, 19 CIT 35, 48 (1995).

domestic products during those years.  See id. at V-9 to V-10,
Table V-3, and at V-13 to V-14, Table V-5.

Second, the Court could not discern how the Commission ensured
that it did not attribute the harmful effects from other recognized
sources of price depression in the U.S. SRAM market to the subject
imports.  See Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1335-36;
see also SAA at 851-52.  In the original determination, the
Commission acknowledged that a learning curve, oversupply, and non-
subject imports also had price depressing effects on the prices of
domestic SRAMs.  See Final Determination at 35, 37.  Yet the
Commission simply concluded that the subject imports themselves had
significant price depressing effects without explaining the basis
for that conclusion, despite the extensive evidence of these other
known sources of price depression.  See Taiwan I, 23 CIT at ___, 59
F. Supp. 2d at 1336.

The Commission's remand determination attempts to address the
Court's concerns.

**2. Analysis**

**a) Price Depressing Effects of Taiwanese SRAM Imports**

On remand, the Commission continues to focus on the newer
products 1 and 2, but now offers a more thorough explanation of
their unique importance.  See Remand Determination at 12-13.  The

Commission explains that "the health of the industry depends upon its success in new products" because, "in the initial period of selling a more advanced version or new generation of a product, firms enjoy a price premium." Id. (citing Final Determination at 22). Therefore, the Commission reasons, the substantial underselling by Taiwanese imports in newer products 1 and 2 took on even greater importance because it impaired the domestic industry's ability to charge expected premium prices. See id.

Regarding product 1, the Commission states, "In the first nine months after the entry of Taiwan imports into the market for Product 1 [in April of 1995], the Taiwan price fell to about half of its original value, maintaining a margin generally about 40 percent below the U.S. price." Id. (citing Staff Report at V-6 to V-7, Table V-1). Over the course of the following three months, the Commission elaborates, the price declines of Taiwanese product 1 became "even more radical," falling to less than one-third of its December 1995 unit price in February 1996. See id. at 12-13 (citing Staff Report at V-6 to V-7, Table V-1). Throughout this overall period, "[d]omestic prices fell precipitously." Id. at 13 (citing Staff Report at V-6 to V-7, Table V-1). The record supports the Commission's assertions regarding the pricing of product 1. See Staff Report at V-6 to V-7, Table V-1. Therefore,

based on the record, a reasonable mind could conclude, as did the Commission, that the significant underselling of Taiwanese product 1 depressed U.S. prices.

The Commission characterizes the pricing of Taiwanese product 2 as "even more stark[.]"  Remand Determination at 13.  The Commission notes that Taiwanese imports of product 2 entered the United States two months after the U.S. industry had introduced the product and "at a price that was one-seventh the domestic product price."  Id. (citing Staff Report at V-8, Table V-2).  The domestic product price fell by almost two-thirds during the following three months and "declined further by the end [of 1997]."  Id. (citing Staff Report at V-8, Table V-2).  Throughout this period, the Commission continues, Taiwanese product 2 consistently undersold the domestic product.  Id. (citing Staff Report at V-8, Table V-2).  The record supports these assertions.  See Staff Report at V-8, Table V-2.  Therefore, based on the record, a reasonable decision maker could conclude, as did the Commission, that the significant underselling of Taiwanese product 2 depressed U.S. prices.

In addition, the Commission explains on remand that the more established Taiwanese products 3 and 5 also had price depressing effects, despite the fact that these products exhibited "mixed

overselling and underselling in 1996-97."[14]   See Remand
Determination at 14-15.  Addressing product 3, the Commission
explains, citing another investigation, "'in a commodity market
characterized by intense price-based competition, a mixed pattern
of under- and overselling is to be expected; such a pattern,
together with increasing volume of subject imports, indicates that
subject imports played a substantial role in the price declines .
. . .'"  Id. at 15 (citing Certain Stainless Steel Plate from
Belgium, Canada, Italy, Korea, South Africa, and Taiwan, Inv. Nos.
701-TA-376, 377, and 379 (Final) and Inv. Nos. 731-TA-788-793
(Final), USITC Pub. 3188, at 19 (May 1999)).

Applying this observation to the current case, the Commission
concludes that Taiwanese product 3 had price depressing effects
because its volume increased and it "undersold the domestic product
in between one-quarter and one-third of comparisons" in 1996-97.
Id. at 15 (citing Staff Report at V-9, Table V-3).  The record,
however, also supports the opposite conclusion.  Margins of
Taiwanese overselling and underselling in product 3 fluctuated

---

[14]Taiwanese product 3 oversold the domestic product 3 in
seven months of 1996 and in ten months of 1997.  See Staff Report
at V-10, Table V-3.  Taiwanese product 5 oversold the domestic
product 5 in seven months of 1996 and in eight months of 1997.
See id. at V-14, Table V-5.

substantially over 1996 and 1997, yet domestic product 3 prices declined fairly steadily and consistently over this period.  See Staff Report at V-10, Table V-3.  Thus, an analysis of the causal nexus between Taiwanese pricing of product 3 and the domestic product 3 price declines requires an interpretation of the evidence.  The Commission has "discretion to make reasonable judgments and inferences in interpreting evidence[.]"  Chung Ling Co., Ltd. v. United States, 16 CIT 843, 846, 805 F. Supp. 56, 61 (1992)(citing Maine Potato Council, 9 CIT at 300, 613 F. Supp. at 1244).

Moreover, we need not belabor whether substantial evidence supports the Commission's conclusion regarding the effects of Taiwanese product 3; the Commission's explanation of Taiwanese product 5's effects adequately addresses the Court's previous concern regarding the Commission's finding of significant price depressing effects despite the fact that the majority of the Taiwanese imports oversold the domestic product during 1996-97.

Regarding product 5, the Commission explains, "In analyzing the effects of subject imports on domestic prices of Product 5, confirmed lost revenue findings are more probative than underselling." Remand Determination at 15.  The Commission points out that a "substantial number of lost revenue allegations for

[product 5] were confirmed[,]" dating from the fourth quarter of 1995 through 1997.  Id. at 15-16 (citing Staff Report at V-24 to V-28, Table V-8).  Based on the evidence of confirmed lost revenue allegations, the Commission concludes that U.S. producers had to "significantly lower[] their prices to avoid losing sales to [Taiwanese product 5]."  Id. at 16.  Also with regard to product 5, the Commission notes "that there is no possibility of false attribution of [price] effects where allegations of losses due to Taiwan imports have been confirmed."  Id.

The record indicates that only one U.S. SRAM producer made the lost revenue allegations concerning Taiwanese product 5.  See Staff Report at V-24 to V-28, Table V-8.  Moreover, all but one of the confirmed lost revenue allegations involved the same purchaser. See id.  Nevertheless, the confirmed lost revenue allegations are at least reasonably indicative of price depression; in each case, the U.S. producer lowered its initial price to avoid losing a sale to Taiwanese imports of product 5.  See id.

Accordingly, substantial evidence supports the conclusion that the subject imports as a whole generally had price depressing effects.  The precise issue, however, is whether the price depressing effects were "significant."  See 19 U.S.C. § 1677(7)(C)(ii).

### b) Other Sources of Price Depression

In examining causation, the Commission must not attribute the harmful effects from other sources of injury to the subject imports.  See SAA at 851-52.  The Commission further bases its remand determination that the subject imports themselves had significant price depressing effects on its explanation of how it ensured that it did not attribute the price effects from the other recognized factors (i.e., the learning curve, non-subject imports, and the 1996-97 oversupply) to the subject imports.

### i) The Learning Curve

The learning curve is the phenomenon by which a firm's manufacturing costs, and hence its prices, decrease as it becomes more efficient in production.  See Final Determination at 22.  The record indicates that "SRAM prices historically show a pattern of steep price declines as the products move along market and production life cycles."  Staff Report at I-20 and V-1.  Addressing the effect of the learning curve on the domestic prices for newer products 1 and 2, the Commission states, "Although the Commission did not adopt a fixed rate for the learning curve, the evidence before the Commission indicated that this process is more gradual than the precipitous falls in new-product prices that occurred during the later part of the POI."  Remand Determination at 14.

The record evidence concerning the learning curve effect in the SRAM industry indicates that the price per bit falls approximately 38% every two years. See Staff Report at V-1; Feb. 18, 1998, Hearing Tr. (List 1, Doc. 252) at 37 ("Hearing Tr."). Domestic product 1 and 2 price declines over 1996 and 1997 were indeed faster than this rate. See Staff Report at V-6 to V-8, Tables V-1 and V-2. Therefore, substantial evidence supports the Commission's conclusion that the price depressing effects of the learning curve did not render the price depressing effects of the subject imports insignificant. The Commission has adequately explained how it ensured that it did not attribute the price depressing effects of the learning curve to the Taiwanese imports.

### ii) Non-Subject Imports

Regarding the non-subject imports, the Commission appears to explain that it did not attribute price depressing effects of non-subject imports to the Taiwanese imports because the non-subject imports were not as competitive as the Taiwanese and domestic product in the U.S. market for fast SRAMs.[15] The Commission explains,

---

[15] By inference, it appears the Commission considers "slow" SRAMs to be SRAMs of access speeds greater than or equal to 55 nanoseconds ("ns"), while it considers "fast" SRAMs to be those of access speeds less than or equal to 34 ns.

> [M]ore than half of the increase by quantity in non[-]
> subject imports in 1996-1997 came in imports from
> countries whose imports are predominantly concentrated in
> slower access speeds.  In contrast, Taiwan imports, like
> domestic industry shipments, are heavily concentrated in
> higher access speeds.  Of non[-]subject imports, only
> non-subject Korean imports are more concentrated in the
> market for fast SRAMs than in the market for slow SRAMs.
> Although the record does not indicate exactly in which
> SRAM products non[-]subject imports as a whole increased
> most, the market share of non-LTFV products from sources
> heavily concentrated in the slower range gained market
> share . . . from 1995 to 1997.  In contrast, the market
> share of non-subject Korean imports decreased slightly[.]

Remand Determination at 9 (citing Staff Report at IV-3, Table IV-2,

at I-10, Table I-1, and at IV-9, Table IV-4).[16]

Based on these findings, the Commission infers that, "in the

part of the market in which the U.S. and Taiwan products

compete[d], non[-]subject imports [did not have a] greater effect

than subject imports."  Id. at 9.  Instead, "[n]onsubject imports

appear to have had their greatest effects in [the market for slow

---

[16]The non-subject imports as a whole were composed of non-
subject imports from Korea and non-subject imports from all other
countries, particularly Japan.  See Staff Report at II-13.
Henceforth, the Court will refer to the non-subject imports from
all other countries as "third source" imports.  The record
indicates that, in 1997, 58.4% of non-subject Korean imports were
in the fast range and 43.1% of third source imports were in the
fast range.  See  Staff Report at I-10, Table I-1.  As indicated
in the above quote, the Commission characterizes the third source
imports as "imports from countries whose imports are
predominantly concentrated in slower access speeds."  Remand
Determination at 9.

SRAMs] in which Taiwan imports compete[d] very little and which represent[ed] a relatively low portion of shipments by the U.S. industry." Id. at 9-10. Thus, the Commission suggests that it did not attribute price depressing effects of non-subject imports to the Taiwanese imports because the non-subject imports were less competitive than the Taiwanese product in the U.S. market for fast SRAMs. See also id. at 10 n.41 ("That non[-]subject imports excluded subject imports and domestic products from [a part of the market] would set the stage for more intense competition between subject imports and domestic product in the part of the market open to them.") and 17. n.76 (stating that the Commission explained in its discussion of the relative volume of subject imports how it ensured "that it was not attributing the price effects of non[-]subject imports to subject imports").

Although there was no industry consensus on the definitions of "fast" and "slow" SRAMs, see Staff Report at I-9, the record adequately supports the Commission's finding of distinct market segments for fast and slow SRAMs in the United States,[17] see id. at

---

[17]Plaintiffs argue that the Commission cannot legally rely on its distinct market segment explanation because the Commission in its original determination had already found no "clear dividing line" between fast and slow SRAMs in finding a single "domestic like product" consisting of SRAMs of all access speeds. See Pls.' Resp. to Remand Views at 16 (citing Final Determination

I-18 ("[I]nterchangeability across SRAMs with different access speeds can be problematic."). In addition, the record supports the Commission's conclusion that the Taiwanese imports and domestic product were concentrated in the market for faster SRAMs. See id. at I-10, Table I-1.

The record does not, however, support the Commission's apparent finding that non-subject imports were less competitive than Taiwanese imports in the domestic fast SRAM market. Instead, the great weight of the record evidence appears to indicate that, although a substantial portion of non-subject imports were concentrated in the U.S. market for slower SRAMs, non-subject imports were also very competitive in the U.S. market for fast SRAMs.

First, in terms of billions of bits, there were more than twice as many non-subject imports of fast SRAMs as a whole than

---

at 10). It is permissible, however, for the Commission to consider the importance of distinct market segments as a condition of competition in its analysis of causation despite a finding of a single domestic like product under 19 U.S.C. § 1677(10). See Bic Corp. v. United States, 21 CIT 448, 452-54, 964 F. Supp. 391, 397-98 (1997); R-M Indus., Inc. v. United States, 18 CIT 219, 226 n.9, 848 F. Supp. 204, 210 n.9 (1994). Indeed, an analysis of market segments plays an important role in the causation context because "the more fungible two products are, the more likely underselling by one will affect the price of another." Bic Corp., 21 CIT at 456, 964 F. Supp. at 400.

Taiwanese fast SRAM imports in 1997.  See Staff Report at I-10, Table I-1, and at IV-7, Table IV-3.  The absolute volume in 1997 of third source fast SRAMs alone was much greater than those from Taiwan.  See id.  Moreover, in the fastest category of SRAMs (access speeds of 14 ns or less), there were more than three times as many non-subject imports as Taiwanese imports.  See id. Finally, in 1997, fast non-subject Korean imports constituted 69.7% of total non-subject Korean imports by value, while fast third source imports constituted 75.2% of total third source imports by value.  See id. at I-10, Table I-1.

In addition, the record indicates that non-subject imports, particularly third source, were dominant in cache memory uses-- functions that utilize fast SRAMs.  See id. at I-11.  For instance, non-subject imports were dominant in the market for cache memory in personal computers ("PCs"), "[o]ne of the largest end uses for SRAMs[.]"   Id. at II-3.  According to the Staff Report, "competition in much of the PC cache market [is limited] to those SRAM suppliers selected by Intel."  Id.  In turn, Intel purchased over 90% of its SRAMs from Japanese and non-subject Korean sources in 1997.  See id.; see also id. at II-13.  Thus, the record indicates that non-subject imports were very competitive in the

U.S. market for PC cache memory,[18] a market that chiefly utilized SRAMs of the fastest category in 1997.  See id. at I-13, Table I-2.

Moreover, the record indicates that the U.S. market for workstations and servers chiefly utilized SRAMs of the fastest category in 1997.  See id.; see also id. at II-4 ("Workstations and servers also consume a large amount of SRAM, and account for a large percentage of the value of SRAM sales.  These applications use very high-end, high-speed SRAMs[.]") and at II-13.  Addressing the sources of products in this market segment, the record states, "This segment is predominantly supplied by SRAMs produced in the United States and non-subject imports, particularly from Japan, although importers of SRAMs from Taiwan reported some shipments in this category."  Id. at II-4; see also id. at II-13.  By value, 37.4% of U.S. SRAM shipments in 1997 were used in workstations and servers, the largest end-use for domestic SRAMs by value.  See id.  In contrast, only 1.4% of Taiwanese SRAMs by value were employed in workstations and servers in the U.S. market in 1997.  See id. at II-2.  Thus, the record indicates that non-subject imports were more competitive than the Taiwanese imports in the domestic

---

[18]Meanwhile, 22.2% of Taiwanese imports by value were used as PC cache memory in 1997.  See Staff Report at II-2, Table II-1.

industry's greatest end-use market by value, a market that utilized SRAMs of the fastest category.  See also id. at II-9 and at II-12 ("Imports from Taiwan are used in a smaller range of end uses than U.S.-produced SRAMs.").

By contrast, Taiwanese imports by value were concentrated in the U.S. market for modems and telecommunications applications in 1997, see id. at II-2, Table II-1, end-uses that primarily employ SRAMs of the next fastest speed category (access speeds of 15-34 ns), see id. at I-13, Table I-2.  Even in the 15-34 ns access speed range, however, the non-subject imports maintained a greater absolute volume in the U.S. market than the Taiwanese imports.  See id. at I-10, Table I-1, and at IV-7, Table IV-3.

Finally, the record's discussion of substitution elasticities also demonstrates that non-subject imports were competitive in the U.S. market segment for fast SRAMs.  The substitution elasticity "reflects how easily purchasers switch from the U.S. product to the subject product (or vice versa) when prices change."  Staff Report at II-15 n.29.  The record indicates that non-subject, domestic, and Taiwanese SRAMs were all within the same range of substitutability with one another, see id. at II-15 and at II-15 n.30; therefore, the record indicates that they were all fungible with one another.  This evidence further undermines the

Commission's distinct market segment finding.

The Court presumes the Commission considered all of the evidence in the record.  See Nat'l Ass'n of Mirror Mfrs. v. United States, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988). Nevertheless, without more, the Court cannot conclude that the record as a whole supports the Commission's apparent finding on remand that non-subject imports were not significantly competitive in the market segment in which domestic and Taiwanese SRAMs were concentrated.  While the Commission has "discretion to make reasonable judgments and inferences in interpreting evidence[,]" Chung Ling, 16 CIT at 846, 805 F. Supp. at 61, it must nevertheless "examine the relevant data and articulate a satisfactory explanation for its action . . . [,]" Motor Vehicle Mfg. Ass'n v. State Farm Mutual Auto Ins. Co., 463 U.S. 29, 43 (1983).  Absent greater explanation, it appears that the Commission "failed to articulate a 'rational connection between the facts found and the choice made.'" Bando Chemical, 16 CIT at 136, 787 F. Supp. at 227 (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)), aff'd, 26 F.3d 139 (Fed. Cir. 1994).

More specifically, the record also supports the conclusion that non-subject imports had price depressing effects on domestic

prices for newer products 1 and 2, the very products for which the Commission emphasizes underselling by Taiwanese imports.[19]  See Remand Determination at 12.  The record indicates that non-subject Korean imports also undersold the domestic product in products 1 and 2.[20]  See Prehearing Staff Report (List 2, Doc. 11) at V-5 to

_____

[19]In its original determination, the Commission explained the importance of new SRAM products as follows:

> [T]he SRAM market is characterized by the frequent introduction of more advanced versions or generations of the domestic like product, which then tend to replace existing products.  The first producer to market a superior product . . . often enjoys favorable pricing for a certain period.  As other producers enter the market and production efficiencies are achieved, however, prices are driven down, and the product in question changes in character from a high value-added product to a commodity-type product.

Final Determination at 21-22; see also Staff Report at I-20.

[20]Regarding product 1, the record indicates that the producer of non-subject Korean imports was the first firm to introduce the product in the United States.  See Prehearing Staff Report at V-5, Table V-1.  U.S. firms marketed product 1 domestically four months later; Taiwanese firms marketed product 1 in the United States five months later.  See id.  That a Korean firm was the first to market product 1 in the United States suggests that that firm was the one that could have reasonably expected to receive a price premium.  Moreover, the non-subject Korean imports entered the U.S. market at a price lower than the introductory Taiwanese product 1 price and less than one-half of the introductory domestic price.  See id.  Although Taiwanese product 1 subsequently undersold non-subject Korean product 1 in 1996 and 1997, non-subject Korean imports of product 1 substantially outsold the U.S. and Taiwanese product in terms of volume during these years.  See id. at V-5 to V-6, Table V-1.
    As explained by the Commission, prices are driven down from

V-6, Table V-1, and at V-7, Table V-2 ("Prehearing Staff Report").

Addressing the underselling by the non-subject Korean imports, the Commission states, "[W]here price comparisons for comparable speed products are available, they show that Taiwan imports generally undersold non[-]subject imports."  Remand Determination at 10 (citing Prehearing Staff Report at V-5 to V-6, Table V-1, and at V-7, Table V-2).  The record does indicate that the Taiwanese imports undersold the domestic product by greater margins than the non-subject Korean imports.  See Prehearing Staff Report at V-5 to V-6, Table V-1, and at V-7, Table V-2.  From this evidence, the Commission concludes that the Taiwanese imports "tended to put downward price pressure on both the domestic industry and those non[-]subject imports with which they competed."  Remand Determination at 10.

The Commission has "discretion to make reasonable judgments

_____

the price premium level as additional suppliers enter the market. See Final Determination at 22.  Consistent with this theory, the record shows that the sharpest relative price decline in the U.S. price for product 2 occurred immediately after the introduction of non-subject Korean product 2.  See Prehearing Staff Report at V-7, Table V-2.  In contrast, the relative price declines in U.S. product 2 during the prior two months--when it only competed with Taiwanese versions of product 2--were not nearly as great.  See id.  The non-subject Korean imports also consistently undersold U.S. product 2, although by lesser margins than the Taiwanese product.  See id.

and inferences in interpreting evidence[.]"  Chung Ling, 16 CIT at 846, 805 F. Supp. at 61.  The Commission makes this conclusion, however, in the context of its apparent finding that non-subject imports were less competitive in the fast SRAM market segment in which domestic shipments and Taiwanese imports were concentrated. See Remand Determination at 9-10.  As discussed above, the Court cannot sustain that finding absent greater explanation.  Therefore, inasmuch as the Commission's determination that the subject imports had significant price depressing effects relies on its market segment finding, as explained, the Court cannot sustain this determination.[21]

---

[21]For instance, the Commission characterizes third source imports--those primarily from Japan--as "non-LTFV products from sources heavily concentrated in the slower [SRAM] range[.]" Remand Determination at 9.  Yet, although the record does not contain pricing data for third source imports, it does indicate that these imports were very competitive, if not more competitive than the Taiwanese imports, in the market for SRAMs selling at premium prices.  For example, regarding the U.S. market for SRAMs utilized in workstations and servers, the Staff Report states,

> Workstations and servers also consume a large amount of SRAM, and account for a large percentage of the value of SRAM sales.  These applications use very high-end, high-speed SRAMs that sell for premium prices.  This segment is predominantly supplied by SRAMs produced in the United States and non-subject imports, particularly from Japan, although importers of SRAMs from Taiwan reported some shipments in this category.

Staff Report at II-4 (emphasis added); see also id. at II-13

### iii) Oversupply

As the Commission points out, demand for SRAMs is a derived demand and thus not price responsive (i.e., demand for SRAMs is inelastic). See Remand Determination at 6; see also Staff Report at II-5 to II-6. Thus, decreasing shifts in supply will tend to lead to price increases, while increasing shifts in supply will tend to lead to price decreases. Primarily because the U.S. industry had misforecast demand, the U.S. SRAM market experienced undersupply during 1995 and oversupply during 1996 and 1997. See Staff Report at V-3. Correspondingly, domestic SRAM prices "peaked in 1995" and "declined significantly" beginning in 1996. See id. On remand, the Commission continues to acknowledge the oversupply "caused by the industry's overestimation of demand" and its price depressing effects.[22] See Remand Determination at 5, 6, and 17.

In the original determination, the Commission recognized the

---

("Competition between non[-]subject SRAMs and subject imports is limited in the workstation market due to limited availability of qualified product for this segment from subject importers.").

[22]In Taiwan I, the Court referred to the oversupply situation as "global oversupply." 23 CIT at ___, 59 F. Supp. 2d at 1335. In response, the Commission states on remand that its "discussion of oversupply was specific to the conditions in the U.S. market" and did not concern "the level of relative supply and demand around the world[.]" Remand Determination at 17. The Court clarifies that it, too, is only concerned with the oversupply situation in the U.S. market despite its use of the phrase "global oversupply" in the prior opinion.

oversupply situation of 1996-97 as a distinct market force that caused significant domestic price declines.    <u>See</u> Final Determination at 23, 35, and 37.    On remand, the Commission states, "[T]he record also suggests that global oversupply, whatever its extent may be, is not an undifferentiated factor whose influence on the United States market is independent of the particular importations that actually occur." Remand Determination at 17.  Thus, the Commission apparently continues to conclude that, despite the oversupply situation, the subject imports themselves had distinct and significant price depressing effects.

If the Court could sustain the Commission's determination that the subject imports themselves had significant price depressing effects, this inference could be reasonable.  As discussed above, however, <u>see</u> <u>supra</u> pp. 36-46, the Court cannot sustain that determination inasmuch as it relies on the Commission's market segment finding.  Because the Commission's explanation of how it ensured that it did not attribute the effects of the 1996-97 oversupply period to the Taiwanese imports is tied to its determination that the Taiwanese imports themselves had significant price depressing effects, we cannot sustain this explanation at this time.

**D. Impact**

The statute directs the Commission to examine the consequent impact of the subject imports on the domestic industry. See 19 U.S.C. § 1677(7)(C)(iii). The Commission must consider "all relevant economic factors which have a bearing on the state of the industry in the United States, including but not limited to" those enumerated. See 19 U.S.C. § 1677(C)(iii); see also supra at n.8.

On remand, the Commission elaborates on its original findings with regard to the impact factor. See Remand Determination at 18. As discussed in the original determination, a condition of competition distinct to the domestic SRAM industry is that it "must make substantial ongoing investments in the research and development of new products and process technologies, and make substantial capital investments to upgrade fabrication equipment and facilities, in order to maintain competitiveness." Final Determination at 36. Therefore, the Commission explains, "the ability of [the domestic] industry to generate income is vital to its ability to make the ongoing investment necessary to remain competitive." Remand Determination at 19. For this reason, although the Commission considered all the factors enumerated in 19 U.S.C. § 1677(7)(C)(iii), it permissibly focused on the U.S. industry's operating income, capital expenditures, research and

development ("R&D") expenditures.

The record indicates that the domestic industry earned significantly less operating income in 1996 than in either 1994 or 1995. See Staff Report at VI-7, Table VI-3. In 1997, the industry suffered operating losses. See id. In its original determination, the Commission explained that, "[a]s a result of the domestic industry's worsening financial condition, it curtailed capital expenditures in 1997 to a level slightly less than half that of either 1995 or 1996." Final Determination at 37 (citing Staff Report at VI-11, Table VI-4). In addition, the Commission pointed out that "[t]he domestic industry's [R&D] expenditures also fell from 1996 to 1997, although the 1997 levels remained higher than in 1994 or 1995." Id. (citing Staff Report at VI-11, Table VI-4). On remand, the Commission continues to conclude that, because the industry is heavily dependent on continuing investment, these economic factors indicate that the U.S. SRAM industry was suffering present material injury. See Remand Determination at 20.

As the Commission acknowledges, despite the fact that the domestic industry invested less in capital and R&D in 1997 than the previous year, it nevertheless invested more in both categories in 1997 than it had in 1994, the beginning of the POI. See Staff Report at VI-11, Table VI-4. Therefore, it is possible that,

rather than investing abnormally low amounts in 1997, the domestic industry in truth invested abnormally high amounts in 1995-96 due to its ability to earn substantially more revenue during the undersupply period of 1994-95. Nonetheless, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966). The record at least reasonably leads to the conclusion that the domestic industry was suffering material injury.

The Commission must make a final determination of whether the domestic industry is materially injured "by reason of" the subject imports. 19 U.S.C. § 1673d(b)(1). The issue remaining, then, is whether "'the [subject] imports themselves made a material contribution to the injury.'" Taiwan I, 23 CIT at ___, 59 F. Supp. 2d at 1327 (citing Gerald Metals, 22 CIT at ___, 27 F. Supp. 2d at 1355).

On remand, the Commission first states that the "relationship between [the confirmed revenue losses for product 5] and industry operating income [losses] . . . provides perhaps the most direct possible evidence of the significant effects of subject imports." Remand Determination at 19. The Commission explains, "For the

period 1996-97, the industry's net operating loss was about $30
million.  In virtually the same period, confirmed revenue losses by
U.S. producers to Taiwan imports alone amounted to more than $40
million."  Id.

The Commission calculates lost revenues from the equation:
**(producer's initial U.S. price quote - U.S. price quote accepted by
buyer) X (quantity sold)**.[23]  Four of the lost revenue allegations
for product 5 had initial price quote dates of "4Q95-1Q97" (i.e.,
the fourth quarter of 1995 through the first quarter of 1997).  See
Staff Report at V-27, Table V-8.  Domestic prices for product 5,
however,  were steadily declining from the fourth quarter of 1995
through the beginning of 1997.  See id. at V-13 to V-14, Table V-5.
Moreover, as discussed above, see supra p. 29, other factors were
causing price declines.  Consequently, the initial quote for each
4Q95-1Q97 allegation is substantially higher than the accepted
quote, thereby potentially inflating the measurement of revenue
lost due to competition from the subject imports.  See id. at V-27,
Table V-8.  Combined, the four 4Q95-1Q97 allegations account for

---

[23]For example, assume a U.S. producer initially quotes a
price per unit of $10, but a buyer is able to negotiate the price
down to $5 per unit.  Consequently, if the producer sells 20
units to the buyer at the accepted price of $5 per unit, the lost
revenues would equal $100.

approximately 94% of all confirmed lost revenue allegations for product 5.  See id.

The Commission concludes that the instances of lost revenues for product 5 had a significant negative impact on the domestic industry's operating income.  Absent an explanation of how it was reasonable to rely on the 4Q95-1Q97 allegations in confirming lost revenues, however, the Court cannot sustain this conclusion as supported by substantial evidence.

In addition, the Commission bases its impact determination on the price depressing effects of the subject imports.  The Commission explains that "the Taiwan underselling had its most direct influence on U.S. prices and volumes for new products." Remand Determination at 19.  The Commission concludes that the significant price depressing effects of the subject imports directly contributed to the domestic industry's worsening financial performance in 1996 and 1997.  See id. at 19-20.  Consequently, the Commission explains, "The relative inability of the U.S. industry to gain sales of new products, at expected premium prices, . . . impair[ed] the U.S. industry's ability to afford further investment, since new products should make a disproportionate contribution to earnings." Id. at 19-20.  The Commission concludes that, because the subject imports significantly contributed to

lowering domestic prices levels, the subject imports themselves made a material contribution to the U.S. industry's poor financial condition.  See id. at 20-21.  As explained above, however, without more, the Court cannot sustain the Commission's determination that the subject imports themselves had significant price depressing effects.  Therefore, we cannot sustain the Commission's affirmative injury determination.

## Conclusion

Absent greater explanation, the Court cannot sustain the Commission's determination that the subject imports had significant price depressing effects inasmuch as the Commission based that determination on its finding that non-subject imports were less competitive than the subject imports in the U.S. market for fast SRAMs.  Therefore, the Court cannot sustain the Commission's affirmative injury determination.  Accordingly, the Commission's determination is remanded for reconsideration consistent with this Court's opinion.  Remand is directed to the entire Commission.

The Commission shall complete its second remand determination by Friday, May 26, 2000; any comments or responses are due by Monday, June 12, 2000; and any rebuttal comments are due by Thursday, June 22, 2000.

_____
Donald C. Pogue
Judge

Dated:     April 11, 2000
           New York, New York