**Slip Op. 00-113**

# UNITED STATES COURT OF INTERNATIONAL TRADE

TAIWAN SEMICONDUCTOR
INDUSTRY ASSOCIATION, ET AL.,

        Plaintiffs,

        and

MOTOROLA, INC.,

        Plaintiff-Intervenor,

        v.

UNITED STATES,

        Defendant,

        and

Micron Technology, Inc.

        Defendant-Intervenor.

BEFORE: Pogue, Judge

Court No. 98-05-01460

[The International Trade Commission's second remand determination is affirmed.]

Decided: August 29, 2000

White & Case, LLP (Christopher F. Corr, Richard G. King, and Lyle Vander Schaaf) for Plaintiffs.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Michael Diehl, Office of the General Counsel, U.S. International Trade Commission, for Defendant.

Hale and Dorr LLP (Gilbert B. Kaplan, Michael D. Esch, Paul W. Jameson, and Cris R. Revaz) for Defendant-Intervenor.

**OPINION**

**Pogue, Judge:** Before the Court is the U.S. International Trade Commission's ("Commission") second remand determination concerning static random access memory semiconductors ("SRAMs") from Taiwan. In its first determination, the Commission concluded that the U.S. SRAM industry was materially injured by reason of imports of SRAMs from Taiwan that were sold at less than fair value ("LTFV"). See Static Random Access Memory Semiconductors from the Republic of Korea and Taiwan, Inv. Nos. 731-TA-761 & 762 (Final)(List 2, Doc. 395)(Apr. 9, 1998) at 37-38 ("Final Determination").[1] The Court could not sustain the Commission's affirmative injury determination, however, because the Commission did not adequately explain how it avoided attributing to the subject imports the harmful effects from other known sources of injury. See Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT ___, ___, 59 F. Supp. 2d 1324, 1336 (1999)("Taiwan I"). Therefore, we remanded the Commission's affirmative determination for reconsideration consistent with the Court's opinion. See id.

On remand, the Commission again determined that the domestic

---

[1]List 1 consists of the documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record.

industry was materially injured by reason of SRAMs from Taiwan.
See Commission's Determ. on Remand (List 2, Doc. 406)(Aug. 30,
1999) at 1 ("First Remand Determination").    Absent greater
explanation, however, the Court again could not sustain the
Commission's remand determination. See Taiwan Semiconductor Indus.
Ass'n. v. United States, 24 CIT ___, ___, slip op. 00-37 at 55
(Apr. 11, 2000)("Taiwan II").[2]    Therefore, we remanded the
Commission's first remand determination for reconsideration
consistent with the Court's opinion.  See id.

In its second remand determination, the Commission now
determines that, pursuant to section 735(b) of the Tariff Act of
1930, as amended, 19 U.S.C. § 1673d(b)(1994), "an industry in the
United States is not materially injured or threatened with material
injury by reason of imports of [SRAMs] from Taiwan that have been
found by the Department of Commerce to be sold in the United States
at [LTFV]." Commission's Determ. on Remand (List 2, Doc. 411)(June
23, 2000) at 1 ("Second Remand Determination").

In reviewing the Commission's second remand determination, we
are presented with the following issues: (1) whether the Commission
conducted its second remand in accordance with this Court's remand

---

[2]Familiarity with the Court's previous decisions in Taiwan I
and Taiwan II is presumed.

order in Taiwan II and otherwise in accordance with law; and (2) whether the Commission's negative determination on remand is supported by substantial evidence.

**Standard of Review**

The Court must sustain the Commission's second remand determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

**Discussion**

### I.    Did the Commission conduct its second remand proceedings in accordance with this Court's remand order in *Taiwan II* and otherwise in accordance with law?

The statute directs the Commission to "make a final determination of whether . . . an industry in the United States . . . is materially injured, or . . . threatened with material injury . . . by reason of [LTFV] imports . . . ."  19 U.S.C. § 1673d(b). The six commissioners comprising the Commission vote to make this determination.  See Taiwan II, 24 CIT at ___, slip op. 00-37 at 4. As more fully described in Taiwan II, the details surrounding the Commission's voting record in its investigation of SRAMs from Taiwan are rather unique.  See id. at ___, slip op. 00-37 at 4-6.

Due to vacancies and a recusal, only two commissioners actually voted in the original determination.  Commissioner Bragg found that the U.S. industry was materially injured by reason of LTFV imports of SRAMs from Taiwan, with Commissioner Miller dissenting.[3]  See Final Determination at 33 n.168.  Accordingly, Commissioner Bragg's decision constituted an affirmative determination of the Commission pursuant to 19 U.S.C. § 1677(11).[4]

"By the time of the remand, three new members had been appointed to the Commission:  Commissioner Askey, Commissioner Koplan, and Commissioner Hillman."  Taiwan II, 24 CIT at ___, slip op. 00-37 at 5.  Nevertheless, only Commissioner Bragg prepared written views on remand.  See First Remand Determination at 1 n.1.  "The Commission . . . submit[ted] [Commissioner] Bragg's remand views to the Court . . . as its 'Views on Remand[.]'"  Id.

In Taiwan II, Plaintiffs argued that the Commission's first remand determination was unlawful because it only constituted the

_____

[3]From the date of the original determination to the present, several commissioners have served as Chairman and Vice Chairman of the Commission.  For the sake of simplicity, we refer to all commissioners by the title "Commissioner."

[4]That provision states, "If the Commissioners voting on [an injury] determination . . . are evenly divided as to whether the determination should be affirmative or negative, the Commission shall be deemed to have made an affirmative determination."  19 U.S.C. § 1677(11).

views of Commissioner Bragg.  See 24 CIT at ___, slip op. 00-37 at 6.  Plaintiffs maintained that all eligible commissioners should have participated in the remand determination, because the applicable statute, case law, and this Court's remand order in Taiwan I all compelled an institutional response.  See id.

Upon reviewing 19 U.S.C. § 1516a(c)(3), the relevant case law, and our own remand order in Taiwan I, we agreed that all eligible commissioners should have participated meaningfully in the remand.  See id. at ___, slip op. 00-37 at 9.  That is, the commissioners should have adequately considered the record evidence and the decision's merits before submitting the remand views of Commissioner Bragg as an institutional response of the Commission.  See id. at ___, slip op. 00-37 at 9-16.  Because there was no clear evidence demonstrating that the full Commission had not meaningfully participated in the remand, however, the Court presumed that the commissioners properly discharged their official duties.  See id.[5]

_____

[5]"The presumption of regularity supporting the acts of agency officials mandates that, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" Taiwan II, 24 CIT at ___, slip op. 00-37 at 9-10 (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15 (1926)); see also United States v. Morgan, 313 U.S. 409, 422 (1941).  "[F]ederal courts have consistently recognized that challengers must satisfy a high

Nevertheless, although Plaintiffs' arguments did not overcome the presumption of regularity supporting the acts of agency officials, see id. at ___, slip op. 00-37 at 11, 15-16, the Court noted, "[B]ecause we are remanding the decision for the reasons explained below, Plaintiffs will, in any event, be afforded the full Commission's reconsideration of the merits of the injury determination[,]" id. at ___, slip op. 00-37 at 16-17.

It is now clear, however, that the new commissioners did not meaningfully participate in the first remand determination. In a motion for extension of time, Defendant stated that, in the first remand proceeding, the new "commissioners did not undertake to themselves reach independent determinations based on a review of the substantive record." Consent Mot. of Def. for Extension of Time to Resp. to Ct.'s Remand Order (Apr. 21, 2000) at 2; see also Second Remand Determination at 2-3.

In the second remand determination, "all participating [c]ommissioners engaged in a substantive review of the record." Second Remand Determination at 3. Commissioners Hillman, Koplan,

---

burden in order to rebut the presumption that agency officials have adequately considered the issues in making a final decision, including their reading and understanding of the record evidence." Id. at ___, slip op. 00-37 at 10 (citations omitted).

and Okun adopted,[6] with some elaboration, the negative material injury and threat determinations made by Commissioner Miller in her dissent issued with the original final determination.[7]  See id. Commissioner Miller reaffirmed her original views offered in her dissent.  See id.  Commissioner Bragg maintained her finding that the domestic industry was materially injured by reason of the Taiwanese subject imports and dissented.  See id. n.8.  Therefore, in its second remand determination, the Commission determined, by a four to one margin, that the domestic industry was not materially injured or threatened with material injury by the Taiwanese imports.

Defendant-Intervenor, Micron Technology, Inc. ("Micron"), now argues that the Commission's second remand determination "constituted an improper *de novo* review of its Final Determination and thereby exceeded the parameters of the Court's second remand

---

[6]As long as they meaningfully participate in the determination, "it is appropriate for commissioners to adopt one another's views."  Taiwan II, 24 CIT at ___, slip op. 00-37 at 12 (citation omitted).  As noted above, the Commission majority has indicated that, in conducting the second remand determination, the commissioners engaged in a substantive review of the record. Accordingly, it was appropriate for the new commissioners to adopt Commissioner Miller's views.

[7]By the date of the second remand, new Commissioner Okun had begun serving her term; Commissioner Crawford's term had expired; and Commissioner Askey had recused herself.  See Second Remand Determination at 2-3.

instructions in Taiwan II, violated the law of the case, and violated Micron's right to due process." Cmts. of Micron in Opp'n to Commission's Second Remand Determination ("Micron Cmts.") at 4-5.

According to Micron, in Taiwan II, the Court sustained the First Remand Determination in nearly all respects, only remanding "two fairly narrowly-drawn issues" for further explanation. See id. at 5-7. Micron is correct that the Court indicated that it could not sustain two findings absent greater explanation. We stated that we could not, without more, "conclude that the record as a whole support[ed] the Commission's apparent finding on remand that non-subject imports were not significantly competitive in the market segment in which domestic and Taiwanese SRAMs were concentrated." Taiwan II, 24 CIT at ___, slip op. 00-37 at 43. We also held that, "inasmuch as the Commission's determination that the subject imports had significant price depressing effects relie[d] on its market segment finding, as explained, the Court [could not] sustain this determination." Id. at ___, slip op. 00-37 at 46. In addition, we could not sustain the Commission's conclusion "that the instances of lost revenues for product 5 had a significant negative impact on the domestic industry's operating income" absent an explanation of how it was reasonable to rely on

certain allegations in confirming lost revenues.  Id. at ___, slip op. 00-37 at 53.

Micron is incorrect, however, insofar as it asserts that the Court's remand order in Taiwan II was necessarily limited to these two issues.  Rather, in expressing our inability to sustain the Commission's affirmative injury determination absent greater explanation of the market segment and lost revenue findings, we invited the Commission to reconsider the merits of its determination.  See id. at ___, slip op. 00-37 at 55 ("Accordingly, the Commission's determination is remanded for reconsideration consistent with this Court's opinion.")(emphasis added).  "[The] Court was free, within reasonable limits, to set the parameters of the remand" to the Commission.  Trent Tube Div. v. Avesta Sandvik Tube AB, 975 F.2d 807, 814 (Fed. Cir. 1992).  Moreover, "[t]he purpose of a remand generally is to require the agency to explain its determination or where appropriate, correct its determination." Trent Tube Div. v. United States, 14 CIT 780, 781 n.1, 752 F. Supp. 468, 470 n.1 (1990), aff'd, 975 F.2d 807 (Fed. Cir. 1992).  Based on the remand order in Taiwan II, the Commission had discretion to reconsider the merits of the injury determination.

Of much greater importance, however, is the fact that, contrary to our presumption in Taiwan II, all eligible

commissioners did <u>not</u> meaningfully participate in the Commission's first remand determination. <u>See</u> <u>supra</u> p. 7. Therefore, in conducting the second remand determination, the eligible commissioners had an obligation to review the record evidence and make informed conclusions regarding the determination's merits in accordance with 19 U.S.C. § 1516a(c)(3), precedent, and the Court's remand orders. <u>See</u> <u>Taiwan II</u>, 24 CIT at ___, slip op. 00-37 at 7-9. As we stated in <u>Taiwan II</u>, despite application of the presumption of regularity, Plaintiffs would in any event "be afforded the full Commission's reconsideration of the merits of the injury determination[,]" since we were remanding the first remand determination. <u>Id.</u> at ___, slip op. 00-37 at 16-17. Therefore, contrary to Micron's assertion, the new commissioners had a duty to evaluate the merits of the injury determination *de novo*, reviewing the statutory factors prescribed in 19 U.S.C. § 1677(7)(B), (C), (F), rather than limiting themselves to the two narrow findings that required greater explanation.

In addition, Micron argues that, by "failing to respect the Court's disposition of the issues addressed in <u>Taiwan I</u> and <u>Taiwan II</u>, the Commission subverted the purpose of judicial review and violated the law of the case." Micron Cmts. at 13. "The law of the case doctrine holds that 'a decision on an issue of law made at

one stage of a case becomes binding precedent to be followed in successive stages of the same litigation.'" Chung Ling Co., Ltd. v. United States, 17 CIT 829, 836, 829 F. Supp. 1353, 1360 (1993)(quoting 1B James W. Moore et al., Moore's Federal Practice ¶ 0.404[1] (2d ed. 1992)).  Micron argues that, because the Court sustained many of the findings in the original and first remand determinations as supported by substantial evidence in Taiwan II, the Commission cannot now reach the opposite conclusions in its second remand determination.  See Micron Cmts. at 14.

Micron's "law of the case" argument is inapposite to the present situation.  In Taiwan II, we did not hold that certain of the conclusions in the first determination were correct as a matter of law.  Rather, we held that certain conclusions were supported by substantial evidence and were otherwise in accord with law.  Such a holding "is not necessarily inconsistent with a holding that the opposite conclusion[s] [were] also supported by substantial evidence and otherwise in accord with law." Trent Tube, 975 F.2d at 814.  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).  Therefore, the "law of the case" doctrine does not apply to this case.  See Trent

Tube, 975 F.2d at 814.

Finally, Micron submits that, by conducting a *de novo* review of the full merits of the injury determination in the second remand, the Commission deprived Micron of due process.  See Micron Cmts. at 14-15.  "If the Commission considered it necessary to reconsider all issues in the proceeding," Micron argues, "it should have: (1) provided an opportunity for the parties to fully brief all issues that the Commission would be addressing in its [second remand determination] and (2) held a hearing before the full Commission to allow parties to provide their views on the issues raised in a *de novo* review."  Id.  at 14-15.

In the administrative proceedings leading up to the original determination, however, Micron already had the opportunity to submit briefs to the Commission regarding whether SRAMs from Taiwan had materially injured the domestic industry.  As these documents were included in the administrative record, the new commissioners surely had access to Micron's views of the case, and the Court presumes the Commission considered them in conducting its second remand determination.  Cf. Taiwan II, 24 CIT at ___, slip op. 00-37 at 43 ("The Court presumes the Commission considered all of the evidence in the record.")(citation omitted).  Moreover, it was not necessary for the Commission to hold a new hearing regarding the

merits of the injury determination; the new commissioners had the benefit of the record transcript of the original hearing concerning the merits, see Feb. 18, 1998, Hearing Tr. (List 1, Doc. 252), and the Court presumes they considered this record evidence.  See Grupo Industrial Camesa v. United States, 18 CIT 461, 464, 853 F. Supp. 440, 443 (1994)("'[A] member of an administrative agency who did not hear oral argument may nevertheless participate in the decision where he has the benefit of the record before him.'")(quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 802 (D.C. Cir. 1965)), aff'd, 85 F.3d 1577 (Fed. Cir. 1996).  Therefore, the Commission did not violate on remand whatever due process rights Micron may have.

For the foregoing reasons, the Court concludes that the Commission conducted its second remand proceedings in accordance with the remand order in Taiwan II and in accordance with law.

## II.  **Is the Commission's negative injury determination on remand supported by substantial evidence and otherwise in accordance with law?**

### A.   Present Material Injury

In its second remand determination, the Commission concludes that the U.S. SRAM industry was not materially injured by reason of the Taiwanese imports.  See Second Remand Determination at 1.  "The term 'material injury' means harm which is not inconsequential,

immaterial, or unimportant."   19 U.S.C. § 1677(7)(A).   "In examining 'whether [the subject] imports have caused material injury to a domestic industry,' the Commission is required under 19 U.S.C. § 1677(7)(B) to consider three factors: (1) the volume of the subject imports; (2) the effect of the subject imports on prices of domestic like products; and (3) the impact of the subject imports on domestic producers of like products."[8] [9]  Taiwan II, 24

---

   [8]In addition, the Commission "may consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  19 U.S.C. § 1677(7)(B)(ii).

   [9]"The Commission evaluates the volume and price effects of the subject imports and their consequent impact on the domestic industry by applying the standards set forth in 19 U.S.C. § 1677(7)(C)."  Taiwan II, 24 CIT at ___, slip op. 00-37 at 19 (citations omitted).  The relevant portions state:

   (i) Volume

   In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

   (ii) Price

   In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whetherB

      (I) there has been significant price

underselling by the imported merchandise
as compared with the price of domestic
like products of the United States, and

(II) the effect of imports of such
merchandise otherwise depresses prices to
a significant degree or prevents price
increases, which otherwise would have
occurred, to a significant degree.

(iii) Impact on affected domestic industry

In examining the impact required to be considered
under subparagraph (B)(i)(III), the Commission
shall evaluate all relevant economic factors which
have a bearing on the state of the industry in the
United States, including, but not limited toB

(I) actual and potential decline in
output, sales, market share, profits,
productivity, return on investments, and
utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative
effects on cash flow, inventories,
employment, wages, growth, ability to
raise capital, and investment,

(IV) actual and potential negative
effects on the existing development and
production efforts of the domestic
industry, including efforts to develop a
derivative or more advanced version of
the domestic like product, and

(V) in a proceeding under [19 U.S.C. §§
1673-1673h], the magnitude of the margin

CIT at ___, slip op. 00-37 at 18-19 (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997)).  "Thus, after assessing whether the volume, price effects, and impact of the subject imports on the domestic industry are significant, the statutory 'by reason of' language implicitly requires the Commission to 'determine whether these factors as a whole indicate that the [subject] imports themselves made a material contribution to the injury.'"[10]  Taiwan I, 23 CIT at ___, slip op. 00-37 at 21 (quoting Gerald Metals, Inc. v. United States, 22 CIT ___, ___, 27 F. Supp. 2d 1351, 1355 (1998)); see also 19 U.S.C. § 1673d(b)(1). Accordingly, "the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports."  Statement of Administrative Action, H.R. Doc. No. 316,

_____

of dumping.

> The Commission shall evaluate all relevant
> economic factors described in this clause within
> the context of the business cycle and conditions
> of competition that are distinctive to the
> affected industry.

19 U.S.C. § 1677(7)(C).

[10]The presence or absence of any factor is not necessarily dispositive to a finding of material injury.  See 19 U.S.C. § 1677(7)(E)(ii).  The Commission has discretion to weigh the significance of each factor in light of the circumstances.  See Iwatsu Elec. Co., Ltd. v. United States, 15 CIT 44, 49, 758 F. Supp. 1506, 1510-11 (1991).

103rd Cong., 2nd Sess. (1994), reprinted in Uruguay Round Agreements

Act, Legislative History, Vol. VI, at 851-52.[11]

### 1.    Volume

The statute directs the Commission to determine "whether the

volume of [the subject imports], or any increase in that volume,

either in absolute terms or relative to production or consumption

in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).

In the second remand determination, the Commission majority

adopted Commissioner Miller's dissenting views to the original

affirmative determination.  See Second Determination at 4.  The

Commission stated,

> [I]f considered apart from the other factors we are
> required to consider, the absolute increase in the volume
> of the subject imports is significant. When evaluated in
> the context of the conditions of competition, however,
> the volume of subject imports, and increase in volume,
> are not sufficient to demonstrate that the subject
> imports themselves made a material contribution to any
> injury experienced by the domestic industry.

Id.

In its second remand determination, the Commission did not

specify which conditions of competition influenced its analysis.

---

[11]The "by reason of" causation standard of 19 U.S.C. §
1673d(b) is more thoroughly set out in Taiwan I, 23 CIT at ___,
59 F. Supp. 2d at 1326-31, and Taiwan II, 24 CIT at ___, slip op.
00-37 at 17-23.

Nevertheless, Commissioner Miller elaborated on the context of the conditions of competition in her original statement of her views. Miller noted that, during the period of investigation ("POI"), "U.S. apparent consumption of SRAMs increased substantially . . . ." First Determination at 39 (Comm'r Miller, dissenting). "In the context of this growing market," Miller continued, "U.S. SRAM producers lost considerable market share to imported SRAMs." Id. at 40. Based on the record Miller concluded, however, that the domestic industry lost market share "overwhelmingly to non-subject imports, rather than to subject imports from Taiwan." Id. Substantial evidence supports these findings.[12] See Staff Report (List 2, Doc. 34) at IV-9, Table IV-4 ("Staff Report"). Because there was "little gain in market share attributable to [the] subject imports[,]" Miller concluded that the increase in Taiwanese imports was not significant in relative terms. Final Determination at 40 (Comm'r Miller, dissenting).

Section 1677(7)(C)(i) affords the Commission the discretion "to analyze the volume of imports in either an absolute or relative

---

[12]Over the POI, the Taiwanese imports' market share increased by just over 2%, while the non-subject imports gained just under 15% of the U.S. SRAM market. See Staff Report at IV-9, Table IV-4. Moreover, the non-subject imports held a much greater share of the U.S. market throughout the POI. See id.

sense depending upon what is appropriate under the circumstances." USX Corp. v. United States, 12 CIT 844, 848, 698 F. Supp. 234, 238 (1988). In Taiwan I, the Court held that substantial evidence supported the conclusion that the subject imports' absolute increase over the POI was significant. See 23 CIT at ___, 59 F. Supp. 2d at 1331. Nevertheless, given the substantial record evidence indicating that U.S. consumption also increased substantially, see Staff Report at IV-7, Table IV-3, and that non-subject imports greatly exceeded the Taiwanese SRAMs in terms of both absolute and relative increases in volume, see id. at IV-7, Table IV-3, and at IV-9, Table IV-4, it was reasonable for the Commission to evaluate the significance of the subject imports in relative terms. Because substantial evidence supports the conclusion that the volume of the subject imports was not significant relative to U.S. consumption, it was reasonable for the Commission to conclude in its second remand determination that the volume of the subject imports lacked significance overall.

In rebuttal, Micron argues, "Nowhere does the statute allow the Commission to negate the significance of import volume based on conditions of competition. The statute requires the significance of import volume be assessed solely in terms of increases considered on an absolute or relative basis." Micron Cmts. at 18.

Micron is incorrect.  First, the conditions of competition that the Commission largely referred to were the substantial increase in U.S. apparent consumption and the much greater market share held by the non-subject imports.  See Final Determination at 39-40. Section 1677(7)(C)(i) clearly allows the Commission to take such factors into account in determining whether the volume of subject imports is significant relative to U.S. consumption.  See Taiwan I, 23 CIT at ____, 59 F. Supp. 2d at 1332 n.12.  Furthermore, the Commission may consider the broader conditions of competition affecting the domestic industry in evaluating the significance of the volume of subject imports.  See Angus Chemical Co. v. United States, 20 CIT 1255, 1266, 944 F. Supp. 943, 952-53 (1996)("The Commission evaluates import volume 'in light of the 'conditions of trade, competition, and development regarding the industry concerned.''")(quoting General Motors Corp. v. United States, 17 CIT 697, 711, 827 F. Supp. 774, 787 (1993)), aff'd, 140 F.3d 1478 (Fed. Cir. 1998); see also S. Rep. No. 96-249, 96th Cong., 1st Sess. at 88 ("The significance of the various factors affecting an industry will depend upon the facts of each particular case.").

Therefore, substantial evidence supports the Commission's conclusion on second remand that the subject imports' volume was not significant.

### 2.  Price Effects

The statute provides that, in evaluating the effect of the subject imports on domestic prices,

> [T]he Commission shall consider whether--(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

In its second remand determination, the Commission majority adopted and elaborated upon Commissioner Miller's discussion of price effects from her dissenting views to the original affirmative determination.  See Second Remand Determination at 4.  The Commission found that "substantial evidence support[ed] the conclusion that price underselling by the subject imports was significant."  Second Remand Determination at 4 n.9.  Nevertheless, the Commission concluded that the Taiwanese imports did not have significant price depressing or suppressing effects.  See id.; see also BIC Corp. v. United States, 21 CIT 448, 458, 964 F. Supp. 391, 401 (1997)("Evidence of underselling alone is legally insufficient to support an affirmative injury determination.").

The Commission collected price information for six SRAM products, designating them products 1 through 6.  The Commission

majority noted that domestic prices for SRAM products 1 through 6 generally "increased substantially during 1994 and through the third quarter of 1995[;] [p]rices then fell substantially beginning in the last quarter of 1995 and throughout 1996, before leveling off somewhat in 1997."  Second Remand Determination at 4.  The record evidence reasonably reflects these domestic price trends. See Staff Report, Tables V-1 to V-6, at V-6 to V-16.  The Commission concluded, however, that subject imports did not contribute significantly to the price trends.  See Second Remand Determination at 4.

In so finding, the Commission emphasized what it characterized as the "strong evidence of a lack of correlation and causative effect between the subject imports and domestic prices."  Id. at 5. The Commission stated,

> With respect to products 3 and 5, which made up a greater share of the subject imports and of the domestic product than the rest of the identified products, the subject imports consistently undersold the domestic product by substantial margins during the time that domestic prices rose, yet mostly oversold the domestic product in 1996 and 1997 when prices fell.

Id.; see also Final Determination at 41-42 (Comm'r Miller, dissenting views).  Substantial record evidence supports these

conclusions.[13]  See Staff Report at IV-7, Table IV-3, and at V-6 to V-16, Tables V-1 to V-6.

Micron notes that in Taiwan II the Court held that substantial evidence supported the conclusion that Taiwanese products 3 and 5 had price depressing effects.  See Micron Cmts. at 21 (citing Taiwan II, 24 CIT at ___, slip op. 00-37 at 32-34).  Nevertheless, the possibility of drawing two inconsistent conclusions does not prevent the Commission's findings in its second remand determination from being supported by substantial evidence.  See Consolo, 383 U.S. at 620.  Based on the evidence indicating mixed patterns of overselling and underselling by Taiwanese products 3 and 5 during the period in which domestic prices were consistently declining, the Commission's conclusion that Taiwanese products 3 and 5 did not significantly affect domestic prices is reasonable.

The Commission majority next addressed products 1 and 2.

---

[13]Combined, Taiwanese products 3 and 5 accounted for over 50% of the Taiwanese SRAM imports in 1996 and over 67% in 1997. See Staff Report at IV-7, Table IV-3, at IV-9, at V-9 to V-10, Table V-3, and at V-13 to V-14, Table V-5.  Meanwhile, products 3 and 5 accounted for just less than 40% of U.S. shipments in 1996 and over 60% of U.S. shipments in 1997.  See id.

Taiwanese product 3 oversold the domestic product 3 in seven months of 1996 and in ten months of 1997.  See id. at V-10, Table V-3.  Taiwanese product 5 oversold the domestic product 5 in seven months of 1996 and in eight months of 1997.  See id. at V-14, Table V-5.

First, the Commission noted that these products "accounted for a small share of shipments of domestic and subject import products . . . ."  Second Remand Determination at 5.  The Commission also pointed out that products 1 and 2 "were relatively new products during the period of investigation, with significant volumes beginning in the fourth quarter of 1995 for product 1 and the first quarter of 1997 for product 2."  Id.  Substantial evidence supports these conclusions.[14]  See Staff Report at IV-7, Table IV-3, and at V-6 to V-8, Tables V-1 and V-2.  Moreover, the record indicates that "SRAMs begin their life cycle as a value-added product but are quickly transformed into a commodity product . . . [;] [a]s a result, SRAM prices historically show a pattern of steep price declines as the products move along market and production life cycles."  Staff Report at I-20.

Based on this information, the Commission concluded that the subject imports did not have significant price depressing effects on domestic products 1 and 2.  Regarding product 1, the Commission first noted that, from January 1996 through January 1997, the

_____

[14]Combined, Taiwanese products 1 and 2 accounted for slightly over 20% of Taiwanese imports in 1996 and roughly 25% of Taiwanese imports in 1997.  See Staff Report at IV-7, Table IV-3, and at V-6 to V-8, Tables V-1 and V-2.  Meanwhile, products 1 and 2 accounted for less than 5% of U.S. shipments in 1996 and less than 10% of U.S. shipments in 1997.  See id.

"price of domestic product 1 fell at roughly the same rate as prices of domestic products 3 and 5." Second Remand Determination at 5-6. The record supports this finding. See Staff Report at V-7, Table V-1, at V-10, Table V-3, and at V-14, Table V-5. Yet, the Commission claimed, because product 1 was a newer product, "prices for product 1 would be expected to fall more rapidly in 1996 than prices for products 3 and 5." Second Remand Determination at 6. That the "prices for domestic product 1 fell less than would be expected based on the price trends for [domestic] products 3 and 5[,]" the Commission reasoned, suggested that the subject imports did not significantly affect domestic prices for product 1. Id.

The Commission's conclusions regarding product 1 are reasonable. The record indicates that the most dramatic domestic price declines for all products generally occurred in 1996. See Staff Report at V-6 to V-16, Tables V-1 to V-6. Based on the evidence that domestic prices for products 1, 3, and 5 fell at approximately the same rate during this year even though Taiwanese products 3 and 5 were both overselling and underselling while Taiwanese product 1 was consistently underselling, the Commission majority reasonably concluded that there was a lack of correlation between the pricing of the subject imports and domestic prices for product 1.

Regarding product 2, the Commission stated, "[P]rices of domestic product 2 fluctuated upward from January through June of 1997, the only year for which we have comparable data, despite [very high margins of underselling by the Taiwanese imports in product 2]." Second Remand Determination at 6. Substantial record evidence supports this finding. See Staff Report at V-8, Table V-2. From this evidence the Commission concluded, "Thus, the limited data for product 2 also demonstrate[d] an absence of a significant price depressing or suppressing effect by subject imports." Second Remand Determination at 6. The record reasonably supports the Commission's conclusion.

Micron challenges the Commission majority's conclusions as to products 1 and 2, pointing to the Court's holding in Taiwan II that substantial evidence supported the conclusions that the significant underselling of newer Taiwanese products 1 and 2 had price depressing effects. See Micron Cmts. at 22. Again, however, the possibility of drawing two inconsistent conclusions does not prevent the Commission's finding from being supported by substantial evidence. See Consolo, 383 U.S. at 620. The record as a whole reasonably supports the Commission majority's conclusion that the subject imports did not have significant price depressing or suppressing effects on domestic products 1 and 2.

Based on the evidence of a lack of correlation between the prices of the subject imports and the domestic products, the Commission majority reasonably concluded that the domestic price declines were not "attributable in significant part to the subject imports."[15]  Second Remand Determination at 6.  In addition, the Commission concluded that the domestic price trends, "including price increases in 1994 and much of 1995, and price declines starting in the fourth quarter of 1995, [were] attributable to market forces other than the subject imports."  Id.

First, the Commission majority noted the undersupply and oversupply conditions that resulted, in part, due to an inaccurate demand forecast.  See Second Remand Determination at 6-7; Final Determination at 41 (Comm'r Miller, dissenting views).  Substantial

---

[15]Regarding products 4 and 6, the Commission majority stated that the price data collected on these products "[were] not useful in [its] analysis because of the very small quantities sold."  Second Remand Determination at 6 n.19; see also Final Determination at 42 n.16 (Comm'r Miller, dissenting views). "[I]t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985).  The record supports the Commission's conclusion that the quantities of products 4 and 6 were relatively small.  See Staff Report at IV-7, Table IV-3, at V-11 to V-12, Table V-4, and at V-15 to V-16, Table V-6.  Therefore, the Commission reasonably discounted the data regarding products 4 and 6 in its analysis.

record evidence supports the Commission's finding that the undersupply condition and the following oversupply condition significantly contributed to the domestic price increases in 1995 and subsequent price declines in 1996. See Staff Report at V-3.

The Commission majority also cited the "learning curve" effect as a factor in the domestic price declines, while noting that "the decline was temporarily interrupted by the inaccurate forecast of demand growth in 1995 . . . ." See Second Remand Determination at 7. The learning curve is a phenomenon by which a firm's manufacturing costs, and hence its prices, decrease as it becomes more efficient in production. See Final Determination at 22. Substantial record evidence supports the Commission's conclusion that the learning curve played a role in the domestic price declines. See Staff Report at I-20 and V-1.[16]

Based on the evidence indicating a lack of correlation between the Taiwanese imports and domestic prices, as well as the evidence

_____

[16]As Micron points out, see Micron Cmts. at 25, in Taiwan II we held that the first remand determination "adequately explained how [the Commission] ensured that it did not attribute the price depressing effects of the learning curve to the Taiwanese imports." 24 CIT at ___, slip op. 00-37 at 36. Nevertheless, the record also reasonably leads to the conclusion that the learning curve contributed to the domestic price declines.

that other market factors caused the domestic price declines,[17] the Commission majority reasonably concluded that the subject imports did not significantly depress or suppress domestic prices.

### 3.   Impact

The statute directs the Commission to examine the consequent impact of the subject imports on the domestic industry.  See 19 U.S.C. § 1677(7)(C)(iii).   The Commission must consider "all relevant economic factors which have a bearing on the state of the industry in the United States, including but not limited to" those enumerated. Id.; see also supra at n.9.   In its second remand determination, the Commission majority adopted Commissioner Miller's views regarding the impact of the subject imports on the domestic industry.  See Second Remand Determination at 8.

In her dissenting views to the original determination, Commissioner Miller analyzed each of the factors enumerated in § 1677(7)(C)(iii) and found that the domestic industry's financial performance had worsened in the latter years of the POI. See Final Determination at 43-45 (Comm'r Miller, dissenting views).

---

[17]In addition, the Commission noted the competition in products 1, 2, 3, and 5 from non-subject imports, although the Commission appears to ascribe less weight to this factor than to the demand misforecast and the learning curve effect. See Second Remand Determination at 7 n.21.

Nevertheless, Miller concluded that the subject imports did not cause the deterioration.  See id. at 45.

Consistent with Miller's analysis, the Commission majority concluded that the domestic industry suffered a "declining financial performance primarily [as] a result of price declines . . . ."  Second Remand Determination at 8.  Because the subject imports did not have significant price depressing effects, however, the Commission concluded that the subject imports did not make a material contribution to the domestic industry's injury.  See id.

The Commission majority's determination is reasonable.  In Taiwan II, we noted that the record reasonably supported the conclusion that the domestic industry was suffering material injury as a result of its weakened financial condition in 1996 and 1997.  See 24 CIT at ___, slip op. 00-37 at 50-51.  In addition, based on the evidence of the domestic price declines beginning in the last quarter of 1995 and continuing through 1996, see Staff Report at V-6 to V-16, Tables V-1 to V-6, the Commission  reasonably concluded that price declines were a primary cause of the domestic industry's poor financial condition.  Finally, because substantial evidence supports the conclusion that the subject imports did not have significant price depressing effects, the Commission reasonably concluded that the subject imports did not make a material

contribution to the domestic industry's injury.

In addition, the Commission majority discussed the evidence of lost revenue allegations.  See Second Remand Determination at 8. In the first remand determination, Commissioner Bragg concluded that the "relationship between [the confirmed revenue losses for product 5] and industry operating income [losses] . . . provide[d] perhaps the most direct possible evidence of the significant effects of subject imports."  First Remand Determination at 19 (citing Staff Report at V-24 to V-28, Table V-8, and at VI-7, Table VI-3).  In Taiwan II, however, we held that, absent an explanation of how it was reasonable to rely on four of the confirmed lost revenue allegations (the "4Q95-1Q97" allegations), the Court could not sustain as supported by substantial evidence the conclusion that the instances of lost revenues for product 5 had a significant impact on the domestic industry's operating income.  See 24 CIT at ___, slip op. 00-37 at 53.

"The Commission calculates lost revenues from the equation: **(producer's initial U.S. price quote - U.S. price quote accepted by buyer) X (quantity sold)**."  Id. at ___, slip op. 00-37 at 52.  The four 4Q95-1Q97 allegations bore a quote date encompassing the fourth quarter of 1995 through the first quarter of 1997. Considering the steady decline in domestic prices from late 1995

through 1997, the Court reasoned that the use of such a long quote date potentially inflated the measurement of revenue lost due to competition from the subject imports. See id. (citing Staff Report at V-13 to V-14, Table V, and at V-27, Table V-8). Combined, the 4Q95-1Q97 allegations accounted for approximately 94% of all confirmed lost revenue allegations for product 5. See Staff Report at V-24 to V-28, Table V-8.

On second remand, the Commission reopened the record to gather additional information on the 1Q95-4Q97 lost revenue allegations. The Commission learned that the purchaser's records regarding these allegations had been destroyed. See May 25, 2000 Mem. INV-X-115, Lynn Featherstone to the Commission (List 2, Doc. 409) at 2. The Commission, however, did speak with the employee who had confirmed the original lost revenue allegations. The employee indicated that prices were typically negotiated on a quarterly basis and that the differential in price quotes in the allegations stayed about the same from the fourth quarter of 1995 through the first quarter of 1997. See id. In addition, the employee "indicated that his firm probably did use import quotes to get prices reduced in order to maximize profitability." Id. at 3.

In its second remand determination, the Commission majority concluded that "the lost revenue allegations in this investigation

[did] not constitute sufficient evidence to indicate that the subject imports had a significant impact on the domestic industry." Second Remand Determination at 8.  The Commission noted that, by quantity and value, the 4Q95-1Q97 allegations constituted "the great bulk" of the lost revenues. See id.  Yet, since prices were negotiated on a quarterly basis, the Commission could not precisely quantify the amount of revenue implicated by these allegations without the rejected and accepted price quotes for each quarter of the time period covered in the allegation (the fourth quarter of 1995 through the first quarter of 1997). See id. at 8 n.23. Consequently, although the Commission found that the domestic revenues lost due to the 4Q95-1Q97 allegations "[did] not appear insubstantial[,]" it nevertheless concluded that, "in the absence of significant price depressing or suppressing effects by the subject imports, . . . the lost revenue allegations alone were insufficient to demonstrate that the subject imports themselves had a significant impact on the domestic industry." Id. at 8.

 The Commission's conclusions are reasonable.  "[I]t is within the Commission's discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence." Maine Potato, 9 CIT at 300, 613 F. Supp. at 1244.  Given that the purchaser's records

regarding the 4Q95-1Q97 allegations had been destroyed, it was reasonable for the Commission to accord less weight to their value. Moreover, the evidence indicating that Taiwanese product 5 generally oversold the domestic product in 1996 and 1997 directly undermines the conclusion that U.S. producers suffered heavy revenue losses in product 5 due to price competition from Taiwanese imports. See Staff Report at V-14, Table V-5. Taken together with the substantial evidence that the subject imports did not have significant price depressing or suppressing effects, the Commission reasonably concluded that lost revenue allegations alone were insufficient to demonstrate that the subject imports themselves had a material negative impact on the domestic industry.

### 4. Conclusion

Substantial evidence supports the Commission majority's conclusion that the subject imports did not make a material contribution to the domestic industry's injury. Therefore, the Court sustains the Commission's negative material injury determination.

### B. Threat of Material Injury

Pursuant to 19 U.S.C. § 1673d(b)(1)(A), the Commission majority also addressed whether the domestic SRAM industry is

threatened with material injury.[18]   In examining the causal

_____

    [18]As Defendant points out, Micron did not challenge the
Commission's threat analysis in Micron's initial comments.  See
Micron Cmts.  Therefore, Defendant did not address the threat
analysis in its rebuttal brief.  See Def.'s Rebuttal to Micron
Cmts. at 1 n.1 ("Micron did not submit comments on the
Commission's discussion on remand of the threat of material
injury, and thus should be regarded as being in agreement with
it.").  In its subsequent rebuttal to Plaintiffs' comments,
however, Micron did challenge the Commission's threat analysis in
the second remand determination.  See Micron Cmts. in Resp. to
Pls.' Cmts at 14-15.  In response, Defendant asserts that Micron
improperly raised the threat issue for the first time in its
rebuttal to Plaintiffs' comments, denying the Commission an
opportunity to respond.
    The Court determines that it is appropriate to review the
Commission's threat analysis on second remand.  First, despite
the fact that Micron has not challenged the Commission's threat
determination at the administrative level, we do not find that
the rule of exhaustion of remedies precludes the Court from
reviewing the issue.  The rule of exhaustion of administrative
remedies is neither absolute nor inflexible.  See 28 U.S.C. §
2637(d)(1994)(the court "shall, where appropriate, require the
exhaustion of administrative remedies")(emphasis added); see also
United States v. Priority Products, Inc., 793 F.2d 296, 300 (Fed.
Cir. 1986)("Congress appears to have . . . grant[ed] the Court of
International Trade some discretion to excuse the failure to
exhaust administrative remedies.").  Here, it is appropriate for
the Court to review the Commission's threat determination because
the Commission clearly considered the issue.  See Second Remand
Determination at 9.  Moreover, in conducting its second remand,
the Commission only invited comments from parties concerning the
new information gathered regarding the lost revenue allegations.
See Static Random Access Memory Semiconductors From Taiwan, 65
Fed. Reg. 31,928 (Commission, May 19, 2000)(notice and scheduling
of remand proceedings).  In addition, although Micron should have
raised the threat issue in its initial comments to the Court, the
Commission is not prejudiced by not having the opportunity to
respond to Micron's rebuttal comments, because the Court affirms
the Commission's negative threat determination.  See discussion
infra pp. 38-44.

connection between the LTFV imports and the threatened material

injury, the statute requires the Commission to consider, "among

other relevant economic factors," nine enumerated factors.  Seven

factors are relevant to consider in this case:[19]

> (II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,
>
> (III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,
>
> (IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,
>
> (V) inventories of the subject merchandise,
>
> (VI) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,
>
>  . . . .
>
> (VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like

---

[19]Neither a countervailable subsidy (factor I) nor a raw agricultural product (factor VII) is involved in this case.

product, and

(IX) any other demonstrable adverse trends that indicate
the probability that there is likely to be material
injury by reason of imports (or sale for importation) of
the subject merchandise (whether or not it is actually
being imported at the time).

19 U.S.C. § 1677(7)(F)(i).[20]

The Commission evaluates these factors by applying the
standards set forth in § 1677(7)(F)(ii). The Commission is to
"consider the factors set forth [above] as a whole in making a
determination of whether further dumped . . . imports are imminent
and whether material injury by reason of imports would occur unless
an order is issued . . . ." Id. Moreover, the "determination may
not be made on the basis of mere conjecture or supposition." Id.
In sum, "the Commission must determine whether the LTFV imports
themselves made a material contribution to the threatened material
injury." NEC Corp. v. Dep't of Commerce, 22 CIT ___, ___, 36 F.
Supp. 2d 380, 392 (1998).

In its second remand determination, the Commission determined
that the U.S. SRAM industry is not threatened with material injury
by reason of the Taiwanese imports. See Second Remand

---

[20]"The presence or absence of any factor which the
Commission is required to consider under [§ 1677(7)(F)(i)] shall
not necessarily give decisive guidance with respect to the
determination." 19 U.S.C. § 1677(7)(F)(ii).

Determination at 9.  In doing so, the Commission majority adopted Commissioner Miller's discussion of threat of material injury from her dissenting views to the original determination.  See id.; see also Final Determination at 45-48 (Comm'r Miller, dissenting).  Below, the Court reviews Commissioner Miller's analysis regarding each of the relevant statutory factors.

Regarding factor II (production capacity), Commissioner Miller concluded, "Despite the planned increases over the longer term, as well as the relative ease with which production capacity can be shifted between different types of semiconductors, I do not find evidence that imminent and significant increases in SRAM exports to the United States are likely."  See Final Determination at 47 (Comm'r Miller, dissenting).  The record reasonably supports this conclusion.  As Commissioner Miller pointed out, several foreign producers reported to the Commission that new capacity would not be dedicated to SRAM production.  See Staff Report at VII-9 to VII-11.  Moreover, for the first year following the POI, 1998, foreign producers projected declines in both capacity and production of SRAMs.  See id. at VII-13, Table VII-2.  Given that the Taiwanese industry's capacity for cased SRAMs[21] was lower in 1997 than in

---

[21]Over the POI, the Taiwanese industry exported significantly more cased (or assembled) SRAMs to the United

either 1995 or 1996, it was reasonable for the Commission to rely on the industry's projections. See id. Therefore, Commissioner Miller reasonably concluded based on the record that production capacity in Taiwan did not indicate a likelihood of increased subject imports to the United States.

Regarding factor III (volume and market penetration), Commissioner Miller concluded, "I do not find that the volume and market penetration of the subject imports indicates a likelihood of substantially increased imports." Final Determination at 47 (Comm'r Miller, dissenting). Substantial record evidence supports this conclusion. First, while the absolute volume of total Taiwanese SRAM exports to the United States increased over the POI, the number was projected to decrease in 1998. See Staff Report at VII-13, Table VII-2. Moreover, as a share of total Taiwanese shipments, SRAM exports to the United States remained relatively steady over the POI. See id. at VII-14, Table VII-2. Therefore, Commissioner Miller reasonably concluded that the record did not indicate a likelihood of substantially increased subject imports to the United States.

_____

States than the two other SRAM types investigated, uncased (or unassembled) SRAMs and SRAM memory modules. See Staff Report at VII-3, Table VII-2.

Regarding factor IV (price effects), Commissioner Miller concluded, "I find nothing in the record to suggest that [the subject] imports are likely to have significant price effects in the future, especially in light of the widespread availability of non-subject imports."  Final Determination at 47 (Comm'r Miller, dissenting).  As discussed above, substantial evidence supports the conclusion that the subject imports did not have significant price effects during the POI.  Moreover, the great weight of the record indicates that non-subject imports were competitive with U.S. SRAMs and maintained a much higher share of the U.S. market throughout the POI.  See Staff Report at I-10, Table I-1, at I-11, at I-13, Table I-2, at II-3 to II-4, at II-9, at II-12, at II-13, at II-15, at IV-7, Table IV-3, and at IV-9, Table IV-4.  Therefore, Commissioner Miller reasonably concluded that the subject imports were not likely to have significant price effects in the future.

Regarding factor V (inventories of the subject merchandise), Commissioner Miller concluded the "inventories of the subject imports also indicate[d] that substantially increased SRAM imports [were] unlikely."  Final Determination at 47 (Comm'r Miller, dissenting).  As Commissioner Miller pointed out, inventories of Taiwanese SRAMs held by U.S. importers increased in absolute quantity over the POI, but declined as a share of total U.S.

imports in the latter part of the POI. See Staff Report at VII-15, Table VII-6. Moreover, inventories of SRAMs held in Taiwan decreased in 1997 in both absolute terms and relative to total Taiwanese shipments. See id. at VII-13 to VII-14, Table VII-2. Therefore, the record reasonably supports Commissioner Miller's conclusion that the inventories of the subject imports did not indicate that substantially increased imports were likely.

Regarding factor VI (potential for product shifting), Commissioner Miller concluded that producers of SRAMs in Taiwan are able to shift production from other memory integrated circuit products to SRAMs. See Final Determination at 46 (Comm'r Miller, dissenting)(citing Staff Report at VII-7). Because several Taiwanese producers projected a decline in both capacity and product of SRAMs, however, Commissioner Miller did not emphasize this factor. See Staff Report at VII-9 to VII-11, and at VII-13, Table VII-2. The Commission has discretion to weigh the significance of each factor in light of the circumstances. See Iwatsu Elec., 15 CIT at 49, 758 F. Supp. at 1510-11. Under the circumstances of this case, it was reasonable for Commissioner Miller not to ascribe substantial weight to the ability of Taiwanese SRAM manufacturers to product-shift.

Regarding factor VIII (domestic development and production),

Commissioner Miller concluded, "I do not find that the subject imports from Taiwan have had an actual or potential negative effect on the development and production efforts of the domestic industry."  Final Determination at 48 (Comm'r Miller, dissenting). The record indicates that, although domestic capital expenditures declined in 1996 and 1997, expenditures had doubled in 1995; thus, the 1997 level was still greater than the amount spent in 1994, the first year of the POI.  See Staff Report at VI-11, Table VI-4. Meanwhile, although research and development expenses had decreased in 1997, the 1997 level was still almost double the 1994 level. See id.  Based on this record evidence, Commissioner Miller reasonably determined that the subject imports did not have significant actual or potential negative effects on development and production of SRAMs in the United States.

Finally, Commissioner Miller found "no indication of any 'other demonstrable adverse trends' that indicate[d] that there [was] likely to be material injury by reason of the subject imports."  Final Determination at 48 (Comm'r Miller, dissenting)(applying 19 U.S.C. § 1677(7)(F)(i)(IX)).  Upon review of the record as a whole, this conclusion appears reasonable.

In its rebuttal brief, Micron argues that the record evidence indicates that the domestic industry is threatened with material

injury by reason of the subject imports.  <u>See</u> Micron's Cmts. in Resp. to Pls.' Cmts. at 14-15.  That Micron "can hypothesize a reasonable basis for a contrary determination[, however,] is neither surprising nor persuasive." <u>Matsushita Elec. Indus. Co. v. United States</u>, 750 F.2d 927, 936 (1984).  The Court concludes that, based on a consideration of the record evidence and the § 1677(7)(F)(i) factors as a whole, the Commission majority reasonably determined that the U.S. SRAM industry is not threatened with material injury by reason of the subject imports.


## Conclusion

The Commission's negative material injury and negative threat of material injury determinations are supported by substantial evidence and are otherwise in accordance with law.  Therefore, the Commission's second remand determination is affirmed.  Judgment will be entered accordingly.

Donald C. Pogue
Judge

Dated:    August 29, 2000
          New York, New York